PAUL DELUCA *vs.* ROBERT J. JORDAN, administrator[1];
GENEALOGY RESEARCH CORPORATION & another,[2] third-party
defendants.

No. 00-P-1545.

Suffolk. April 12, 2002. - January 15, 2003.

Present: BECK, BERRY, & McHUGH, JJ.

*Executor and Administrator,* Accounts, Fiduciary duty. *Fiduciary. Fraud. Negligence,* Misrepresentation. *Damages,* Negligent misrepresentation.

A Probate Court judge properly reopened the respondent administrator's final fiduciary account under G. L. c. 206, § 24, due to constructive fraud, and properly surcharged the administrator for monies that he had accounted for as paid to one of two heirs at law, where the record did not demonstrate that the administrator had made reasonable efforts to determine the truth or falsity of the representations in his account regarding payment to that heir, or that such efforts failed through no fault of the administrator; rather, having performed no due diligence with regard to independent verification of certain facts regarding that heir, the administrator presented to the Probate Court false representations of fact susceptible to knowledge, and omitted material facts. [133-136]

On an heir's petition to reopen the respondent administrator's final fiduciary account under G. L. c. 206, § 24, in which the administrator filed a third-party complaint for negligent misrepresentation against a lawyer who claimed to represent the two heirs at law and a genealogy research corporation, and against that genealogy research corporation, this court remanded the matter to the Probate Court for a determination whether the administrator reasonably believed that either the lawyer or the genealogy research corporation, or both, had been engaged by the petitioner heir; whether, and to what degree, the administrator accorded reliability to the representations of, and the information and documents provided by, the lawyer and the genealogy research corporation because of the administrator's reasonable belief that one or both had been hired by the petitioner heir; whether the misrepresentations and misinformation provided by the lawyer and the genealogy research corporation were contributing factors in the administrator's ultimate liability to the heir for breach of fiduciary duty; and if so, whether damages, and in what amount, were to be awarded to the

[1]Of the estate of Amadeo DeLuca, also known as Amadio DeLuca.
[2]Alan L. Lewis.

administrator for any allocable share of his surcharge liability that was attributable to negligent misrepresentations by either or both of the third-party defendants. [136-139]

PETITION filed in the Suffolk Division of the Probate and Family Court Department on May 29, 1989.

A petition to vacate the decree allowing an accounting and for restoration of wrongfully paid distributions, filed on September 23, 1999, was heard by *Nancy M. Gould*, J.

*Thomas P. Collins* for Robert J. Jordan.

*Herbert D. Lewis* for Alan L. Lewis.

*Arnold E. Cohen* for the plaintiff.

BERRY, J. Robert Jordan, a lawyer appointed by the Probate Court as administrator of the estate of Amadeo DeLuca (DeLuca), appeals from an amended judgment reopening his final fiduciary account due to constructive fraud, and surcharging him for monies that Jordan had accounted for as paid to one of the two heirs at law, Paul DeLuca (Paul). The basis for the surcharge was that Jordan breached his fiduciary duties when, confronted with obvious discrepancies calling into question the authenticity of Paul's purported signature on a series of documents, including the petition for administration and the ultimate legacy receipt, Jordan did not undertake reasonable steps to independently verify whether Paul was aware of the probate proceedings, had signed the probate pleading and other material documents, or had received his distributive share. The proceeds that Jordan represented in the accounting as paid to Paul were fraudulently diverted by Paul's brother, Anthony DeLuca (Anthony), the other heir at law. Jordan also appeals from that part of the amended judgment granting directed findings in favor of Attorney Alan Lewis and Genealogy Research Corporation (GRC) on Jordan's third-party complaint against them. We vacate so much of the amended judgment as disposed of Jordan's third-party claims of negligent misrepresentation against Lewis and GRC, but we otherwise affirm.

1. *Factual and procedural background.* The matter of reopening the account under G. L. c. 206, § 24, was tried to a Probate Court judge. The judge's findings, based on the probate

documentary exhibits and the testimony of Jordan and Paul, may be summarized thusly. Amadeo DeLuca died intestate in 1987, at the age of eighty. He was survived by his two sons, Anthony and Paul. DeLuca and the mother of Anthony and Paul had divorced decades before when the two sons were young children, and thereafter the two sons had very limited contact with their father. At the time of DeLuca's death, Anthony and Paul had not lived in Massachusetts for many years.

In June, 1988, DeLuca's sister, Anna LaRocca, filed a petition to be appointed administrator of the estate. LaRocca's petition omitted Anthony and Paul, listing as the only next of kin DeLuca's two brothers and three sisters. One of the brothers filed a handwritten objection to LaRocca's petition, on the basis that DeLuca's sons had been omitted. Given this objection, LaRocca's petition was not allowed. Instead, the Probate Court sought appointment of a public administrator. The appointment devolved upon Jordan, who had close to twenty years' experience as a public administrator.

On December 15, 1988, Jordan filed a petition for public administration of DeLuca's estate. At the time of filing, the whereabouts of Anthony and Paul were not known. By some means, the record is not clear how, GRC became involved. In January, 1989, GRC contacted Jordan and forwarded two agreements purporting to set terms and conditions by which GRC had been engaged by both Anthony and Paul. The agreements provided that GRC would receive twenty percent of the estate assets recovered. Paul's address and the date of his alleged signing were left blank on the agreement — the address omission being especially unusual since GRC was supposed to have located Paul, the formerly missing heir. Notwithstanding the omissions, Jordan undertook no due diligence, made no inquiry of GRC and did nothing himself to attempt to reach Paul to verify the engagement of GRC. In fact, Paul's signature was a forgery.[3]

Given the apparent discovery of the rightful heirs, rather than

---

[3]The trial judge made findings that Paul's signature on this and other pertinent documents was forged. The judge also found that Anthony, whose signature on the petition is genuine, ultimately misappropriated Paul's share of their father's estate.

pursue the petition for public administration, in May, 1989, Jordan prepared a petition for administration. The Probate Court preprinted form petition for administration of an intestate estate contains a signature block, with an address line, by which an heir may assent both to the petition and to the appointment of the named administrator, here Jordan. On May 2, 1989, Jordan forwarded this new petition to GRC, with a letter requesting that GRC obtain signed assents. The petition was returned to Jordan by GRC with purported signatures of assent by Anthony and Paul.

Jordan filed the "assented to" petition on May 29, 1989, and the next day was appointed administrator. On the petition, the address block following Paul's name contains only a reference to "c/o Anthony DeLuca," followed by Anthony's address. Jordan had inquired about, and obtained from GRC, Anthony's full address. But Jordan either did not ask for, or asked for and did not receive, an answer concerning Paul's address. Jordan filed the petition full well knowing it was flawed. As Jordan admitted, the shared address got him thinking that something might be askance. Yet, despite the same type of address gap on the petition as had existed on the GRC agreement, as well as information Jordan had obtained from Anna LaRocca concerning mistrust within the family and "derogatory" information about the relationship between Anthony and Paul, Jordan still undertook no due diligence investigation. In fact, Paul's signature on the petition was a forgery.

In addition to information about dissension among the family members, Jordan had also learned from LaRocca that her deceased brother had rented a safe deposit box at an East Boston bank. In DeLuca's safe deposit box, Jordan found $41,900 in cash. When the petition for public administration had first been filed, the estate was listed as only having $2,000, so this safe deposit box yielded a cache that was the principal asset of the estate.

Thereafter Alan Lewis, a Massachusetts attorney, appeared on the scene. Lewis purportedly acted as counsel for GRC, Anthony, and Paul. Lewis, although a third-party defendant and represented by counsel at trial, did not appear or testify, notwithstanding that Lewis had been intimately involved in the

processing of the estate on behalf of his three "clients."[4] Even though Jordan understood Lewis to be representing all three, Jordan made no inquiry concerning the potential for conflict arising out of this joint representation — a conflict enhanced by virtue of the fact that Lewis had a financial interest in a five percent cut of the twenty percent of the estate distributions in which GRC claimed an interest. Jordan admitted that he was aware both that Lewis would not be forwarding the entire distribution to the beneficiaries, but would be holding back the GRC percentage, and that of the twenty percent hold back, Lewis would be keeping a share for himself "to make sure he got his fee."

On May 16, 1990, Jordan filed an account of the estate with the Probate Court. The account listed assets of $44,437.82 and expenses of $8,918.45. On August 6, 1990, Jordan filed a petition for distribution for the balance of $35,519.42. Based on that filing, on August 6, 1990, the Probate Court issued a warrant (or decree) for distribution. The court's warrant specifically directed that Jordan was to distribute $17,759.71 to Anthony and the same amount to Paul, as the sole heirs of the DeLuca estate. Jordan, however, did not follow the terms of the court's warrant. Instead, Jordan issued two checks for $17,759.71 dated August 15, 1990, one payable to "Alan Lewis Attorney for Anthony DeLuca" and the other to "Alan Lewis Attorney for Paul DeLuca." The petition for distribution filed by Jordan failed to disclose that there was to be any such intervening transfer of funds to Lewis. Moreover, Jordan was aware that Lewis would not be forwarding the full $17,759.71 to each of the two beneficiaries, also known as Lewis's clients, but would be deducting the GRC share.

After he had sent Lewis the two checks, Jordan "started to revolve around in my mind earlier conversations with Anna LaRocc[a], and I thought, well, maybe I better get these legacy receipts notarized." "My hackles . . . went up when I had the same address for — when I heard the same address for both people and secondly my conversation with . . . maybe it was

---

[4]Lewis's trial counsel, who was his brother, stated that Lewis did not attend trial because he was out of State, taking care of his wife who was seriously ill.

Anna LaRocc[a] and the fact that there was a petition filed by somebody who left the two sons out and we later discovered there were two sons — these all started to work together to make me apprehensive . . . ." Jordan then called Lewis and requested that the legacy receipts be notarized. According to Jordan, after he heard of the derogatory family information from Anna LaRocca, he "really kept [his] eye on everybody from that point on."

That eye was less than discerning, for when Jordan received the "notarized" receipts from Lewis, there were again obvious irregularities that apparently did not fall within the orb of Jordan's eye. As the Probate Court judge found, "[i]t is unlikely that upon receiving these two legacy receipts Mr. Jordan did not see the flaws with Paul's purported legacy receipt. The fact that Mr. Jordan ignored these defects contained in Paul's legacy receipt, and instead, reported to the court that all was carried out accordingly is troubling." Specifically, Paul's receipt lacked a standard notary attestation. Instead, the purported notarization was broken up into parts in a manner not conventional for notarization. The words "Subscribed and Sworn to Before Me" appear not within a notary block, but were inserted above Paul's signature, and, below Paul's signature, the rest of the scattered notarization appears in a split sequence: between the typed-in phrases "Witness to Signature," and "Notary Public-State of Texas," there appears one signature, "Jaime Godinez" (on Anthony's receipt, distinct signatures appear for the witness and the notary). Furthermore, the notary seal imprinted on the original document bears the name "Santiago Godinez," not Jaime Godinez, the signer. Also absent from Paul's receipt is the customary indication of the expiration date of the notary's commission. Once again, Paul's signature was a forgery.

Despite the flawed configuration of the supposed notarization for Paul's signature, Jordan did not direct Lewis to withhold the checks. Moreover, Jordan made no inquiry of Lewis or GRC, and did nothing himself to attempt to reach Paul to verify that he had received the distribution and signed the legacy receipt.[5] From his side, Lewis, who had received this strange "notariza-

---

[5]Jordan, at some point, did have one telephone conversation with Anthony. He never tried to contact Paul.

tion," also did nothing — that is to say, did nothing concerning verification. Instead, what Lewis did was to deduct the twenty percent and issue two checks from his client account for $14,207.77, one payable to Anthony and the other to Paul De-Luca — the latter "client" being a man with whom Lewis had never communicated. Lewis's cover letter to Anthony and Paul, again a part of this most unusual pattern, was enclosed with the two checks in a single envelope mailed to Anthony's address in Texas.

The checks were deposited to a bank in El Paso, Texas, where Anthony lived. The transit stamps on both checks reflect deposit into the same numbered account in the name of Anthony DeLuca. The endorsement on Paul's check is a forgery.

Jordan never inspected the checks. Had he done so, the transit stamps would have revealed the joint deposit. The lack of any inspection by Jordan is telling in light of the fact that the warrant of distribution by the Probate Court issued to him as a fiduciary, charged with distribution of an estate, required that, "[w]ithin one year after the date hereof, you [the administrator] are required to present to this Court, certified by the accountant, a true account of the payments made by you . . . and also to return this order and the receipts of the persons whom you have paid." In response to this court order, Jordan filed a certification of distribution which stated: "I hereby certify under the penalties of perjury that I have paid, according to the foregoing order [the warrant of distribution] all the before-named persons [referencing Anthony and Paul DeLuca] the sums to which they are entitled, as appears by their respective receipts . . . ." Jordan also filed the two legacy receipts. The discrepancy in the distributive payments was hidden in the probate filing because the legacy receipts showed the full $17,759.71 as having been distributed to each of Anthony and Paul.

The forgeries and fraud came to light nine years later.[6] In April, 1995, Paul was trying to reach his father because Anthony

[6]Part of the delay in Paul's discovery of the fraud is attributable to the fact that, from 1989 to 1993, Paul was incarcerated in a California prison on drug offenses. On the issues presented in this case concerning Paul's prolonged lack of knowledge of his father's death, the probate case, and the forgeries of Paul's signature, the judge found Paul's testimony wholly credible.

was ill (Anthony died shortly thereafter). Paul was informed by his mother that she thought, but was not certain, that his father Amadeo DeLuca may have died. On subsequent visits to Massachusetts in 1998 and 1999, Paul searched public records to try to locate his father, or to learn of his fate. He eventually located a death certificate. Thereafter, Paul discovered the petition for administration and, with further inquiry, discovered the fraud.

On September 23, 1999, Paul filed a petition to vacate the judgment, reopen the account, and surcharge Jordan. Jordan filed his third-party complaint against Lewis, GRC, and the two men named as witness and notary on the legacy receipt.[7] Following a trial on the matter at which Paul and Jordan testified and the pertinent documents were introduced as exhibits, the petition to reopen Jordan's account was allowed. The Probate Court judge entered comprehensive findings, concluding, in the final analysis, that "Mr. Jordan was negligent, and that the representations he made in the underlying action were technically fraudulent since they were made without personal knowledge and without having exerted any effort to obtain and/or verify the information himself." Accordingly, the judge held Jordan liable, removed him as administrator, appointed another attorney as administrator de bonis non, and surcharged Jordan for Paul's share of the estate, plus accrued interest and attorney's fees. The judge also granted directed findings in favor of GRC and Lewis on Jordan's third-party complaint against them.

2. *The reopening of the account and the surcharge for breach of fiduciary duties.* At the outset, Jordan contends that there was not legal ground under G. L. c. 206, § 24, to reopen the final account. Jordan further argues that, even if the account was properly reopened under § 24, there was insufficient evidence to support the judge's finding that Jordan failed to act reasonably, violated his fiduciary obligations, and therefore should be surcharged.

In reopening the account under § 24 for "fraud or manifest error," the judge applied the doctrine of constructive fraud recognized in the seminal trust case of *National Academy of*

---

[7] The third-party defendants James Godinez and Santiago J. Godinez were never served.

*Sciences* v. *Cambridge Trust Co.*, 370 Mass. 303, 308-309 (1976). That case involved a testamentary trust subject to a restrictive provision terminating distribution of income to the testator's widow upon remarriage. In the event of her remarriage, the remainder of the trust corpus was to revert to the National Academy of Sciences. In violation of its fiduciary duties as testamentary trustee, Cambridge Trust made no inquiry to ensure compliance with the restrictive provision and, for close to twenty-two years, continued to distribute trust income to the widow after her remarriage. The Supreme Judicial Court held that the accounts, albeit decreed final, were subject to reopening for fraud under § 24, and the trustee was accountable to the academy:

> "We hold today that 'fraud' as used in G. L. c. 206, § 24, contemplates this standard of constructive fraud at least to the extent that the fiduciary has made no reasonable efforts to ascertain the true state of the facts it has misrepresented in the accounts. This rule is not a strict liability standard, nor does it make a trustee an insurer against the active fraud of all parties dealing with the trust. Entries in the accounts honestly made, after reasonable efforts to determine the truth or falsity of the representations therein have failed through no fault of the trustee, will not be deemed fraudulent or provide grounds for reopening otherwise properly allowed accounts."

*Id.* at 309. Jordan seeks to distinguish *National Academy of Sciences* by contending that he undertook reasonable efforts to distribute the estate proceeds to the rightful beneficiaries, but his efforts were circumvented by the misconduct of others. From there, Jordan argues that he falls within the reservation that a trustee should not be an "insurer" against the fraud of others.

Jordan's defense, however, never crosses the threshold because the record does not support that Jordan made "reasonable efforts to determine the truth or falsity of the representations" in his account, nor is this a case where such efforts "failed through no fault of the trustee." *Ibid.* As the Probate Court judge reasoned, "[g]iven his knowledge that heirs had

already been omitted once for interests adverse to their own, Mr. Jordan should have used more diligence than he did in verifying that the heirs received proper notice."[8] Rather than apply such due diligence to determine the "true state of the facts," Jordan was willfully blind to the storm front billowing on the horizon. Clouds concerning Paul's status began to gather with the missing address and date on the GRC agreement, further amassed with the "c/o Anthony" reference on the petition, deepened with the miscreant notarization on the distribution receipt, and became full blown with the bank depository transits reflecting the deposit of both checks into Anthony's account. Despite all these darkening clouds, Jordan did not undertake any reasonable inquiry. Rather, the *only* step Jordan undertook was to request notarized legacy receipts, and even then Jordan did not inspect the obviously flawed receipts he received.

In these circumstances, Jordan's fiduciary obligations required more in the way of independent verification. Having performed no such due diligence, Jordan, as did the fiduciary in *National Academy of Sciences*, imprudently presented to the Probate Court false representations of facts susceptible to knowledge, and omitted material facts.[9] Furthermore, there is substantial question whether Jordan made entries in the account "honestly," given his failure to disclose in the probate pleadings the distributions being made to Lewis and GRC as conduits, with a twenty percent interest in the transaction. Hence, the accounts were

---

[8]In this respect, the judge's reliance on *Welch* v. *Flory*, 294 Mass. 138 (1936), was apt. In that case, as here, "by exercising more diligence [the administrator] might have located the petitioner . . . . The facts found and already narrated show that the respondent was mildly active, if not actually slothful, in his attempt to locate the petitioner. . . . The respondent occupied a position of trust with respect to the petitioner. That position required the putting forth of every reasonable effort to discover him. Instead of making that industrious and persevering search, he took the responsibility of representing to the court [information as to the heir's status that turned out to be false] . . . . That was a subject about which he had almost no reliable information." *Id.* at 142-143.

[9]We do not dwell on Jordan's challenge to the sufficiency of the evidence; it falls for the reasons stated above.

properly reopened, and Jordan was properly surcharged by the Probate Court judge.[10]

3. *The third-party complaint against GRC and Lewis.* Jordan's third-party complaint against Lewis and GRC included separate claims for negligent misrepresentation and negligence. We address the negligent representation claims.[11] In granting the directed findings in favor of the third-party defendants, the judge reasoned that, while GRC and Lewis engaged in "conduct and representations [that] were questionable in this case, there was no conclusive evidence on which to attach upon them a fiduciary duty to protect Paul's interests." The liability of Lewis and GRC for negligent misrepresentation, however, does not depend upon establishing a fiduciary duty to protect Paul's interests. Rather, such liability turns on whether, because of incompetence or a failure of due care, GRC and Lewis made misrepresentations and provided false information on which Jordan justifiably relied. On this point, the judge expressly found that "GRC . . . and Attorney Alan Lewis, held themselves out to Mr. Jordan as being representatives of the interests of the heirs. Moreover, Attorney Alan Lewis held himself out as a legal representative who was retained by GRC and the heirs."

We thus analyze this issue under the standard set forth in the Restatement (Second) of Torts § 552 (1977), which has been adopted in Massachusetts case law. Section 552(1) provides:

> "One who, in the course of his business, profession or employment, or in any other transaction in which he has a

---

[10]Jordan's argument that the forging of Paul's signature constituted an intervening criminal act that severed the causal link between Jordan's negligence and Paul's loss is unavailing. "The intervening criminal act of a third party is a superseding cause which breaks the chain of proximate causation only where the original wrongdoer reasonably could not have foreseen such act." *Copithorne* v. *Framingham Union Hosp.*, 401 Mass. 860, 862 (1988). See *Mullins* v. *Pine Manor College*, 389 Mass. 47, 62 (1983). The trial judge found that Jordan should have foreseen that parties adverse to each heir might interfere with the proper administration of the estate. The obvious deficiencies on the face of the documents support the judge's finding that Jordan should have foreseen foul play.

[11]The negligence claim was predicated on the alleged failure of GRC and Lewis to discover the forgery. Jordan's brief fails to provide reasoned appellate argument and legal authority on this claim, and we decline to consider it. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

Liability to third parties under § 552 for negligent misrepresentation has been applied in professional and business contexts that bear analogy to the business of GRC. These analogous business contexts involve information provided to third-party nonclients by accountants, financial institutions, and real estate brokers engaged by the client.[12] We see no reason why GRC would not be subject to the same § 552 standard with respect to the representations it made to Jordan in connection with the administration of the DeLuca estate.

With respect to Lewis's role as counsel, the § 552 standard has also been applied to an attorney's liability for negligent misrepresentation to a third-party nonclient. The case of *Kirkland Constr. Co.* v. *James*, 39 Mass. App. Ct. 559, 561-563 (1995), illustrates that application. In that case, a nonclient brought a claim against the law firm concerning a representation by the firm's attorneys regarding the client's ability to pay the nonclient construction company for renovation work. The nonclient company claimed it was induced to its financial detriment to do business with the client because of the attorneys' negligent misrepresentation concerning the financial stability of the client. The complaint was dismissed because of lack of an attorney-client relationship, similar to the situation here. In reversing in *Kirkland*, we observed that the § 552 duty of reasonable care had been applied to attorneys in their dealings

---

[12]As applied to accountants, see, e.g., *Nycal Corp.* v. *KPMG Peat Marwick LLP*, 426 Mass. 491, 495-496 (1998), and *Reisman* v. *KPMG Peat Marwick LLP*, ante 100, 124-125 (2003); financial institutions, see, e.g., *Golber* v. *BayBank Valley Trust Co.*, 46 Mass. App. Ct. 256, 258-259 (1999); insurers and insurance brokers, see, e.g., *St. Paul Surplus Lines Ins. Co.* v. *Feingold & Feingold Ins. Agency, Inc.*, 427 Mass. 372, 376 (1998), and *Cole* v. *New England Mut. Life Ins. Co.*, 49 Mass. App. Ct. 296, 300 (2000); real estate brokers, see, e.g., *Lawton* v. *Dracousis*, 14 Mass. App. Ct. 164, 171 (1982); and architects, see, e.g., *Nota Constr. Corp.* v. *Keyes Assocs., Inc.*, 45 Mass. App. Ct. 15, 20-21 (1998).

with nonclient business people, so long as there was no conflict with the attorney's duty to the client. *Id.* at 562.

Under the legal analysis of *Kirkland,* the trial evidence in this case provided a basis upon which a trier of fact could conclude that (1) Lewis made a representation that Paul was his client; (2) Jordan justifiably relied upon that representation, both in and of itself and as supporting the accuracy of other information provided by Lewis, and that this reliance "guided" Jordan in his conduct of the estate administration; (3) the untrue representation was either knowingly or carelessly made, in that Lewis had not been retained as counsel for Paul; (4) Lewis knew, or should have known, that Jordan would rely upon his representation and the information he provided[13]; and (5) Lewis made the representation and provided information with the objective of inducing Jordan to enter into a transaction that would benefit Lewis and his client, GRC.[14] *Id.* at 563.

One final note on third-party liability: that Jordan is liable to Paul for breach of his fiduciary duties as administrator does not negate any claim Jordan may have against the third-party defendants for negligent misrepresentation. Jordan's full liability to Paul is not inconsistent with the possibility that his liability, in some part, may be attributable to Jordan's justifiable reliance on negligent misrepresentations of the third-party defendants.[15] As previously explained, the liability of Lewis and

---

[13]See, e.g., *Greycas, Inc.* v. *Proud,* 826 F.2d 1560, 1566 (7th Cir. 1987) (attorney's reliance on representation of fellow attorney that latter had performed lien search was reasonable where there was no reason to suspect fellow attorney was careless or dishonest). The state of the record is that Lewis did nothing to alert Jordan to the fact that Lewis had never been in contact with Paul. Nor does the record show that Lewis attempted to limit his involvement, as he now attempts to do in his brief. See *Petrillo* v. *Bachenberg,* 139 N.J. 472, 486-488 (1995) (attorney could have limited his liability by disclosing incomplete information on which he based his report).

[14]Like Jordan, Lewis argues on appeal that the intervening criminal acts involving forgery of Paul's signature broke the chain of causation. For the reasons previously stated, see note 10, *supra,* we disagree.

[15]From Jordan's perspective, he argues that it was reasonable for him to rely on the representations of Lewis, who held himself out as counsel to Paul. The engagement of another attorney to represent an heir is not a substitute for a fiduciary's independent duties of care and inquiry. Furthermore, even if we assume that a fiduciary may, in the general course of estate administration,

GRC to Jordan, if any, turns on independent duties of care under § 552.

Accordingly, on remand, in reviewing whether the claims for negligent misrepresentation have merit, the judge may consider (1) whether Jordan reasonably believed that either GRC or Lewis, or both, had been engaged by Paul; (2) whether, and to what degree, Jordan accorded reliability to the representations of, and the information and documents provided by, GRC and Lewis because of Jordan's reasonable belief that one or both had been hired by Paul; (3) whether the misrepresentations and misinformation GRC and Lewis provided were contributing factors in Jordan's ultimate liability to Paul; and (4) if so, whether damages, and in what amount, are to be awarded Jordan for any allocable share of Jordan's surcharge liability that is attributable to negligent misrepresentations by either one of, or both of, the third-party defendants.[16]

4. *Conclusion.* Based on the foregoing, we vacate so much of the amended judgment as grants directed findings in favor of GRC and Lewis on Jordan's third-party claims against them for negligent misrepresentation. We remand these claims for further

rely on basic factual information provided by an attorney representing an heir, here, there were exceptional circumstances taking the case outside of the general rule. Those exceptional circumstances include not only the obvious flaws in the operative documents, but Lewis's conflict of interest in the joint representation of GRC, Anthony, and Paul.

From the opposite perspective, Lewis argues that the fiduciary obligations all lay with Jordan; that there was not reason, in fact or in law, by which Lewis could be held accountable for Jordan's failings to undertake due diligence inquiry; and that, hence, the directed finding was correct. To the contrary, Jordan's reliance on representations of Lewis as an attorney is not mutually exclusive of Jordan's independent fiduciary obligations as administrator of the estate to verify information. Put another way, whether Jordan justifiably relied on representations made to him by Lewis qua attorney is a distinct issue from whether he met the separate and independent fiduciary obligations of an administrator. This is similarly the case for the third-party defendant, GRC, differing only in respect to the fact that GRC was not presenting itself as an attorney, who has attendant ethical obligations to which Jordan may have afforded additional deference.

[16]Jordan was liable to Paul on a theory of breach of fiduciary duty. That theory of liability sounds in tort, see *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 517 (1997); *Kirley* v. *Kirley,* 25 Mass. App. Ct. 651, 653-654 (1988), and makes contribution available. Restatement (Second) of Torts § 552(2)(b) (1997); G. L. c. 231B, §§ 1 et seq.

consideration under the correct legal standard, though no new evidence need be taken unless the judge deems otherwise. The amended judgment is otherwise affirmed.

*So ordered.*