Lifespan v. NEMC, et al.          CV-06-241-JL  5/24/11

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

Lifespan Corporation

   v.

New England Medical Center, Inc.,
now known as Tufts Medical Center
Parent, Inc., and New England
Medical Center Hospitals, Inc., now
known as Tufts Medical Center, Inc.

   and

Martha Coakley, Attorney General for
the Commonwealth of Massachusetts,
Intervenor

Civil No. 06-cv-421-JNL
Opinion No. 2011 DNH 083

### FINDINGS OF FACT & RULINGS OF LAW AFTER BENCH TRIAL

This case arises from a dispute between a non-profit healthcare system and a non-profit hospital over their brief and unsuccessful affiliation.  Lifespan Corporation, which runs a network of hospitals in Rhode Island, sued New England Medical Center ("NEMC"), a Massachusetts hospital that had joined Lifespan's system from 1997 to 2002, alleging that NEMC failed to make certain payments required by their disaffiliation agreement. NEMC, admitting non-payment but accusing Lifespan of misconduct during the affiliation, brought a counterclaim for indemnification under that same agreement (along with several other counterclaims on which this court granted summary judgment to Lifespan, see Lifespan Corp. v. New Eng. Med. Ctr., Inc., 731 F. Supp. 2d 232 (D.R.I. 2010)).  The Massachusetts Attorney General, invoking NEMC's status as a public charity, intervened

in the case on behalf of the public interest, see Fed. R. Civ. P. 24, and brought a counterclaim against Lifespan for breach of fiduciary duty to NEMC, based on the same alleged misconduct.

This court, which is sitting by designation in the District of Rhode Island and has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity), held a three-week bench trial in February and March 2011, hearing testimony from nearly 20 witnesses, most of them current or former executives at Lifespan and NEMC. The parties each submitted proposed findings of fact and rulings of law, both before and after trial, along with supporting memoranda. They also submitted, pursuant to this court's customary practice for bench trials, a joint statement of agreed-upon facts and a joint timeline. With the assistance of those materials, this court makes the following findings of fact and rulings of law, see Fed. R. Civ. P. 52(a)(1), which result in a net award of $272,756 to NEMC, after deducting the payments that NEMC owes Lifespan under the disaffiliation agreement ($13,903,948) from the amount of Lifespan's liability to NEMC and the Attorney General ($14,176,704) for its misconduct during the affiliation.

## I. <u>Background</u>[1]

## A. *The parties*

1. Lifespan is a non-profit healthcare system with its headquarters in Providence, Rhode Island. It is an umbrella organization that provides managerial, administrative, and other support services to its hospital subsidiaries, which include Rhode Island Hospital (the main teaching hospital for Brown University's medical school), Miriam Hospital, Newport Hospital, and Bradley Hospital, all located in Rhode Island. It is the largest healthcare system in the Ocean State.

2. NEMC, now known as Tufts Medical Center, is a non-profit hospital located in the Chinatown neighborhood of Boston, Massachusetts, with about 415 beds, 500 faculty physicians, 400 other physicians (including residents, interns, and fellows), and a large nursing staff. It is the teaching hospital for Tufts University's medical school and focuses on providing complex tertiary and quaternary care. It is one of the oldest permanent medical facilities in the United States.

3. The Massachusetts Attorney General is the chief law enforcement officer in Massachusetts and has supervisory authority over the Commonwealth's public charities, including NEMC. <u>See</u> Mass. Gen. L. ch. 12, § 8 ("The attorney general shall

---

[1]This section consists of factual findings pursuant to Fed. R. Civ. P. 52(a)(1).

3

enforce the due application of funds given or appropriated to public charities within the commonwealth and prevent breaches of trust in the administration thereof.").

## B.   *The affiliation*

4.   In 1996 and 1997, NEMC engaged in a search for a potential merger partner.  Many of NEMC's competitors had merged or otherwise affiliated in prior years, leaving NEMC as one of the smallest teaching hospitals in the Boston area.  For that and other reasons, NEMC had been in a downward spiral, losing money, patient volume, and its ability to participate in one of the area's major insurance networks (Harvard Pilgrim Health Care). There was a significant risk that NEMC would not be able to survive on its own.

5.   NEMC approached a number of potential merger partners, including a for-profit healthcare system (Columbia/HCA) and a religious healthcare system (Caritas Christi), but those talks broke down over philosophical differences.  NEMC ultimately decided to affiliate with Lifespan, a non-profit healthcare system with a compatible mission.  They executed a memorandum of understanding in January 1997, proposing an affiliation in which Lifespan would become NEMC's corporate parent, and NEMC would in turn become one of the hospital subsidiaries in Lifespan's system.

6. Lifespan saw the proposed affiliation as an opportunity to expand its healthcare system beyond Rhode Island into Massachusetts, in preparation for what it anticipated (wrongly, as it turned out) would be a movement toward "regionalization" of the healthcare industry across state lines.

7. NEMC saw the proposed affiliation as a way to improve its financial condition, reduce its corporate overhead, gain leverage in its negotiations with health insurers, and obtain more referrals of complex cases. In addition, the affiliation would give NEMC an opportunity to claim a "loss on sale" (i.e., an accounting write-down for asset depreciation), for which it could seek partial reimbursement from the Centers for Medicare and Medicaid Services under then-applicable regulations. See 42 C.F.R. § 413.134(f) (1997).

8. After signing the memorandum of understanding, Lifespan and NEMC each conducted "due diligence" on the proposed affiliation. They also submitted the proposal to various regulatory bodies, including the Massachusetts and Rhode Island Attorneys General, for review and approval. Once the due diligence had been completed and the regulatory approvals received, Lifespan and NEMC entered into a final Amended and Restated Master Affiliation Agreement in October 1997.

9. The Affiliation Agreement provided that Lifespan would establish Lifespan of Massachusetts, Inc. ("LOM"), a non-profit

entity. LOM, in turn, became the sole voting member of NEMC, with the power to oversee and control its operations, including major financial decisions, budgeting, strategic planning, policymaking, and contractual negotiations with health insurers. Lifespan had majority control of LOM and, through it, the ability to control NEMC.

10. In exchange for NEMC's agreement to join Lifespan's system and submit to its control, Lifespan agreed to transfer $8.7 million per year to NEMC, which resulted in a total transfer of about $42 million over the course of the affiliation. NEMC, in turn, agreed to pay its share of Lifespan's corporate overhead expenses, which totaled about $172 million over the course of the affiliation. See Part III.D, infra (discussing the corporate overhead charges in greater detail).

11. During the affiliation, Lifespan and NEMC each had its own board of directors or trustees, and each board had its own finance committee. Lifespan had the power to appoint and remove the members of NEMC's board. NEMC, in turn, had minority representation (not to exceed 20 percent) on Lifespan and LOM's boards. Given this structure, NEMC's board felt powerless and uncertain of its role, to the point where one member (a law school dean) resigned in frustration.

12. Lifespan and NEMC also each had its own chief executive officer ("CEO"), chief financial officer ("CFO"), and various

other executive officers. NEMC's CEO and CFO reported directly and regularly to their counterparts at Lifespan, whom they regarded as their superiors. Lifespan had the power to hire and fire them and, through its compensation committee, set their compensation.

13. During the first three years of the affiliation, NEMC's financial situation improved somewhat, largely because of its return to the Harvard Pilgrim network.[2] But, setting aside the depreciation write-down and other non-operational accounting adjustments, NEMC continued to lose money. See Part III.E, infra (discussing NEMC's financial performance in greater detail). And despite considerable effort, the parties were unable to grow a network in Massachusetts.

14. During the last two years of the affiliation, NEMC's financial situation deteriorated further. NEMC became increasingly upset with Lifespan over the performance of its health insurer contracts, see Part III.B, infra, the unfavorable outcome of a complex financial transaction, known as an interest rate swap, recommended by Lifespan's CFO, see Part III.C, infra, and the amount of Lifespan's corporate overhead charges, see Part III.D, infra.

---

[2]That return resulted primarily from political pressure that NEMC and its allies applied to Harvard Pilgrim in Massachusetts (not from the affiliation itself).

## C. *The disaffiliation*

15. Recognizing that the affiliation was not working, NEMC proposed, and Lifespan agreed, to disaffiliate through a Restructuring Agreement signed in September 2002 and then closed in November 2002. The Restructuring Agreement required NEMC to make a series of payments to Lifespan totaling $30 million and also to "split on a 50/50 basis . . . any recovery received from Medicare by NEMC . . . for the loss on sale/depreciation recapture resulting from the Affiliation."[3]

16. NEMC paid most of that $30 million to Lifespan. But, at the direction of its new CEO Ellen Zane, NEMC refused to pay the final two installments due in 2006 and 2007, totaling $3.66 million. As grounds for non-payment, NEMC claimed that it had sustained losses far in excess of that amount because of Lifespan's misconduct during the affiliation, including with regard to (1) the health insurer contracts, (2) the interest rate swap, (3) the corporate overhead charges, and (4) NEMC's overall financial performance.

---

[3]At that point, it was uncertain whether NEMC would recover anything from Medicare, which had initially denied NEMC's reimbursement claim; NEMC was pursuing an administrative appeal of that decision.

## D. *The litigation*

17. Lifespan brought suit against NEMC in the District of Rhode Island in 2006, alleging breach of contract and seeking to recover the $3.66 million that NEMC refused to pay. NEMC brought a counterclaim against Lifespan under the Restructuring Agreement's indemnification provision, see Part II.C, infra (discussing that provision in greater detail), seeking to recover the losses allegedly caused by Lifespan's misconduct. NEMC also brought counterclaims for breach of fiduciary duty, unjust enrichment, and unfair business practices.

18. Lifespan moved for summary judgment on its breach of contract claim. See Fed. R. Civ. P. 56. Although NEMC admitted non-payment of the $3.66 million, putting it in clear breach of the Restructuring Agreement, the court (Torres, J.) declined to enter judgment for Lifespan, ruling that "NEMC's promise to pay Lifespan and Lifespan's promise to indemnify" were so "closely related" that they needed to be resolved through a single judgment. See Lifespan Corp. v. New Eng. Med. Ctr., Inc., No. 06-421, 2008 WL 310967, at *2-3, 2008 U.S. Dist. LEXIS 7776, at *7-8 (D.R.I. Feb. 1, 2008).

19. After that ruling, NEMC finally resolved its Medicare reimbursement claim, recovering $20,487,895 from Medicare for the "loss on sale" resulting from the affiliation. Upon learning of that recovery, Lifespan amended its complaint to add a contract

9

claim for half of it. NEMC responded by adding more counterclaims, asserting that the Restructuring Agreement's Medicare recovery provision was inapplicable, unconscionable, contrary to public policy, lacking in consideration, a violation of the Affiliation Agreement, a breach of fiduciary duty, and an unjust enrichment.

20. The District of Rhode Island transferred the case to this court in 2009, after all of the available judges there recused themselves. The case has at all times remained on the District of Rhode Island docket.

21. Shortly after that transfer, this court granted a motion by the Massachusetts Attorney General to intervene in the case on behalf of the public interest, see Fed. R. Civ. P. 24, pursuant to her supervisory authority over NEMC as a public charity, see Mass. Gen. L. ch. 12, §§ 8 et seq. After intervening, the Attorney General joined in nearly all of NEMC's counterclaims against Lifespan (except for the indemnification and unfair business practices claims). She did not assert any new claims of her own.

22. The parties then cross-moved for partial summary judgment. See Fed. R. Civ. P. 56. Specifically, NEMC and the Attorney General moved for summary judgment on the issue of whether Lifespan owed a fiduciary duty to NEMC during the affiliation. After concluding that Massachusetts law governed

10

all of the parties' claims, this court ruled that Lifespan did owe a fiduciary duty to NEMC, by virtue of its control over a non-profit hospital and the "faith, confidence, and trust" that NEMC placed in its judgment and advice. Lifespan, 731 F. Supp. 2d at 238-41 (quoting Doe v. Harbor Schs., Inc., 843 N.E.2d 1058, 1064 (Mass. 2006)).

23. Lifespan moved for summary judgment on its claim for half of NEMC's recent Medicare recovery, and on nearly all of the counterclaims (except for NEMC's indemnification claim, which the parties agreed was trialworthy). This court ruled that Lifespan was entitled to half of the Medicare recovery, rejecting the slew of counterclaims challenging the Restructuring Agreement's Medicare recovery provision. Id. at 244-49. Following Judge Torres's approach, however, this court declined to enter judgment for Lifespan, because NEMC's "closely related" indemnification claim was still unresolved. Id. at 249 (quoting Lifespan, 2008 WL 310967, at *2-3).

24. This court further ruled that NEMC had released its tort counterclaims against Lifespan through the Restructuring Agreement, including its claims for breach of fiduciary duty and unfair business practices, leaving itself only a contractual remedy under the agreement's indemnification provision. Id. at 241-43 (citing Eck v. Godbout, 831 N.E.2d 296, 303 (Mass. 2005)). This court also rejected NEMC's other counterclaim, for unjust

11

enrichment, as unavailable in light of NEMC's contractual remedy. Id. at 244 (citing Okmyansky v. Herbalife Int'l of Am., Inc., 415 F.3d 154, 162 (1st Cir. 2005)).

25. This court ruled, however, that the Attorney General was not bound by NEMC's release and could therefore proceed to trial on her claim for breach of fiduciary duty. Id. at 243. Lifespan argued that the Attorney General's claim was barred by the statute of limitations, but this court ruled that no limitations period applies to such a claim when brought by the Attorney General. See Lifespan Corp. v. New Eng. Med. Ctr., Inc., No. 06-421, 2010 WL 3718952, at *1-2 (D.R.I. Sept. 20, 2010) (document no. 166) (citing Davenport v. Atty. Gen., 280 N.E.2d 193, 197 (Mass. 1972)).[4]

E. *The trial*

26. This court held a three-week bench trial in New Hampshire in February and March 2011. Because only the Attorney General's breach of fiduciary duty claim and NEMC's

---

[4]Lifespan now argues, in a similar vein, that the Attorney General's claim is barred by laches. But "Massachusetts law is clear that '[t]he defense of laches is not available to the defendants where the proceeding is brought by an authorized public agency to enforce the law of the Commonwealth.'" FDIC v. Gladstone, 44 F. Supp. 2d 81, 90 (D. Mass. 1999) (quoting Bd. of Health of Holbrook v. Nelson, 217 N.E.2d 777 (Mass. 1966)). Moreover, Lifespan has not shown either unreasonable delay by the Attorney General or prejudice, as would be required to establish that defense. See, e.g., A.W. Chesterton Co. v. Mass. Insurers Insolvency Fund, 838 N.E.2d 1237, 1249 (Mass. 2005).

12

indemnification claim were still in genuine dispute (Lifespan's breach of contract claim having essentially been resolved by the prior rulings, albeit without an entry of judgment, see Lifespan, 731 F. Supp. 2d at 249; Lifespan, 2008 WL 310967, at *2-3), this court treated the Attorney General and NEMC as plaintiffs during the trial, and Lifespan as the defendant.

27. The parties presented testimony from nearly 20 witnesses, most of them appearing live and a few by deposition. They included high-level NEMC executives (its former chairman of the board, its current and former CEOs, its former CFOs, and its former budget director), high-level Lifespan executives (its chairman, former vice chairman, current and former CEOs, current and former CFOs, corporate compliance director, and payor contracting director), a representative from the financial services firm with which NEMC executed the interest rate swap, and the parties' expert witnesses.

## II.  Applicable legal standards[5]

### A.  *Lifespan's breach of contract claim*

28.  To recover on a claim for breach of contract under Massachusetts law, Lifespan must prove each of the following three elements by a preponderance of the evidence:  "(1) that the

---

[5]This section consists of legal rulings pursuant to Fed. R. Civ. P. 52(a)(1).

13

parties reached a valid and binding agreement"; "(2) that [NEMC] breached the terms . . . of the agreement"; and "(3) that [NEMC] suffered damages from the breach." Michelson v. Digital Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999) (applying Massachusetts law); see also, e.g., Singarella v. City of Boston, 173 N.E.2d 290, 291 (Mass. 1961).

## B. *Attorney General's breach of fiduciary duty claim*

29. To recover on a claim for breach of fiduciary duty under Massachusetts law, the Attorney General must prove each of the following four elements by a preponderance of the evidence: (1) the existence of a fiduciary duty from Lifespan to NEMC; (2) breach of that fiduciary duty by Lifespan; (3) damages to NEMC; and (4) a causal connection between the breach of fiduciary duty and the damages. See, e.g., Hanover Ins. Co. v. Sutton, 705 N.E.2d 279, 288-89 & n.18 (Mass. App. Ct. 1999).

30. "A fiduciary duty exists when one reposes faith, confidence, and trust in another's judgment and advice." Harbor Schools, 843 N.E.2d at 1064. Again, this court has already ruled that Lifespan owed a fiduciary duty to NEMC during the affiliation, by virtue of its control over a non-profit hospital and the faith, confidence, and trust that NEMC placed in its judgment. See Lifespan, 731 F. Supp. 2d at 238-41. That ruling is incorporated by reference here.

14

31.  The "central tenet" of a fiduciary duty "is the duty on the part of the fiduciary to act for the benefit of the other party to the relation as to matters within the scope of the relation," exercising "utmost good faith."  Harbor Schools, 843 N.E.2d at 1064-65.  That duty includes both (1) a duty of loyalty and (2) a duty of care.  See, e.g., Blackstone v. Cashman, 860 N.E.2d 7, 17 (Mass. 2007) (citing Spiegel v. Beacon Participations, Inc., 8 N.E.2d 895, 904 (Mass. 1937)).

32.  The duty of loyalty requires a fiduciary "to act with absolute fidelity" to the other party and to place the other party's interests above its own.  Demoulas v. Demoulas Super Mkts., Inc., 677 N.E.2d 159, 179 (Mass. 1997) (quoting Spiegel, 8 N.E.2d at 904).  A fiduciary "may not act out of avarice, expediency, or self-interest in derogation of [its] duty of loyalty."  Donahue v. Rodd Electrotype Co. of New Eng., Inc., 328 N.E.2d 505, 515 (Mass. 1975).

33.  The duty of care requires "complete good faith plus the exercise of reasonable intelligence."  Boston Children's Heart Found., Inc. v. Nadal-Ginard, 73 F.3d 429, 433 (1st Cir. 1996) ("BCHF") (quoting Murphy v. Hanlon, 79 N.E.2d 292, 293 (Mass. 1948)).  "Under this standard," a fiduciary is "not responsible for mere errors of judgment or want of prudence."  Id. (citing Sagalyn v. Meekins, Packard & Wheat, Inc., 195 N.E. 769, 771 (Mass. 1935)).  Liability attaches only where the fiduciary acts

15

in bad faith, or with "clear and gross negligence." Id. (citing Spiegel, 8 N.E.2d at 904).[6]

34. The measure of damages recoverable for a breach of fiduciary duty is the amount necessary to put the other party "in the position [it] would have been in if no breach of fiduciary duty had been committed." Berish v. Bornstein, 770 N.E.2d 961, 977 (Mass. 2002). "Under Massachusetts law, trial courts are vested with the discretion to determine the amount of damages for fiduciary breaches according to the peculiar factors of each individual case." BCHF, 73 F.3d at 435 (citing Chelsea Indus., Inc. v. Gaffney, 449 N.E.2d 320, 327 (Mass. 1983)).

35. For damages to be recoverable, they must be causally connected to the breach of fiduciary duty. See, e.g., Reinhardt v. Gulf Ins. Co., 489 F.3d 405, 412 (1st Cir. 2007) (citing Sutton, 705 N.E.2d at 280). Causation has two components: the plaintiff must prove that the breach was both (1) "a but-for cause" of the damages, and (2) "a "substantial legal factor in

_____

[6]That standard incorporates the "business judgment" rule, which shields corporate officers and directors from liability for good-faith business judgments reasonably believed to be in the corporation's best interests. See, e.g., Halebian v. Berv, 931 N.E.2d 986, 991 n.11 (Mass. 2010). The Attorney General argues that the business judgment rule should not apply in this charitable context. But Massachusetts law expressly extends that rule to officers and directors of charitable corporations. See Mass. Gen. L. ch. 180, § 6C. Moreover, BCHF involved the oversight of a charity providing medical care at a Boston teaching hospital, making it closely analogous. This court will apply the standard set forth in BCHF.

16

bringing about . . . the harm," which is known as proximate causation.  <u>Id.</u> (citing <u>Tritsch v. Boston Edison Co.</u>, 293 N.E.2d 264, 267 (Mass. 1973)).


**C.   *NEMC's indemnification claim***

36.   To recover on a claim for contractual indemnification under Massachusetts law, NEMC must prove by a preponderance of the evidence that it has suffered losses covered by the indemnification provision in the Restructuring Agreement.  <u>See</u>, <u>e.g.</u>, <u>Spellman v. Shawmut Woodworking & Supply, Inc.</u>, 840 N.E.2d 47, 49 (Mass. 2006).

37.   Under Massachusetts law, "an indemnity provision . . . is to be interpreted like any ordinary contract, with attention to language, background, and purpose."  <u>Caldwell Tanks, Inc. v. Haley & Ward, Inc.</u>, 471 F.3d 210, 216 (1st Cir. 2006) (quoting <u>Speers v. H.P. Hood, Inc.</u>, 495 N.E.2d 880-881 (Mass. App. Ct. 1986)).  As a "basic rule of construction," the court "must give effect to the parties' intentions and construe the language to give it reasonable meaning wherever possible."  <u>Shea v. Bay State Gas Co.</u>, 418 N.E.2d 597, 601 (Mass. 1981).

38.   NEMC claims that it has suffered losses covered by two parts of the Restructuring Agreement's indemnification provision: one relating to "willful misconduct and gross negligence," and

17

the other relating to "misrepresentation[s]." This court will discuss each provision in turn.

### i. *Willful misconduct and gross negligence*

39. The Restructuring Agreement provides that "Lifespan will indemnify NEMC for any losses it incurs that result directly and solely . . . from Lifespan's willful misconduct or gross negligence in the provision of services to NEMC by Lifespan employees working under the supervision and direction of Lifespan employees during the Affiliation Period."

40. The term "willful misconduct" means misconduct that is either intentional or involves "such recklessness as is the equivalent of intent," and carries a "great chance" of causing harm to another. Dillon's Case, 85 N.E.2d 69, 74 (Mass. 1949). It "is much more than mere negligence, or even than gross or culpable negligence." Drumm's Case, 903 N.E.2d 1127, 1129 (Mass. App. Ct. 2009) (quoting O'Leary's Case, 324 N.E.2d 380, 384 (Mass. 1975)).

41. The term "gross negligence" means "very great negligence, or the absence of slight diligence, or the want of even scant care." Altman v. Aronson, 121 N.E. 505, 506 (Mass. 1919). It is "substantially and appreciably higher in magnitude than ordinary negligence" and "a manifestly smaller amount of watchfulness and circumspection than the circumstances require of

18

a person of ordinary prudence."  Id.; accord Matsuyama v. Birnbaum, 890 N.E.2d 819, 847 (Mass. 2008).

### ii. *Misrepresentations*

42.  The Restructuring Agreement also provides that Lifespan "shall indemnify and hold harmless NEMC . . . from, against, and in respect of any and all Losses, incurred or suffered by [NEMC] as a result of, arising out of or directly or indirectly relating to," among other things, "[a]ny misrepresentation by Lifespan, or any breach or failure of any covenant, or any breach or inaccuracy in any representation or warranty made by or on behalf of Lifespan in this Agreement, including in any Schedule or Exhibit (as each such representation or warranty would read if all qualifications as to knowledge and materiality were deleted therefrom)."

43.  Lifespan argues that the phrase "in this Agreement" modifies not only the "representation or warranty" clause, but also the "misrepresentation" and "covenant" clauses, meaning that only a misrepresentation in the Restructuring Agreement itself would be covered.  But that argument "is inconsistent with the general rule of grammatical construction that a modifying clause is confined to the last antecedent unless there is something in the subject matter or dominant purpose which requires a different

19

interpretation." <u>Deerskin Trading Post, Inc. v. Spencer Press, Inc.</u>, 495 N.E.2d 303, 307 (Mass. 1986) (quotation omitted).

44. <u>Deerskin</u> involved a contract provision stating that "in the event of 1) breach of any warranty or 2) delays in delivery, caused in part by circumstances over which [the supplier] has no direct control (such as availability of paper and other raw materials) the liability of [the supplier] shall be limited to a refund." <u>Id.</u> The Massachusetts Supreme Judicial Court rejected the argument that the "no direct control" clause modified the "breach of any warranty" clause, finding "no language in the limitation of damages provision and nothing in the subject matter or dominant purpose of [that] provision that requires [that] conclusion." <u>Id.</u> The court noted that "the parenthetical phrase 'such as availability of paper and other raw materials' included in the no direct control clause clearly indicates that the clause was meant to apply only to delays in delivery." <u>Id.</u>

45. The analysis here is similar. The phrase "in this Agreement" is followed by a parenthetical that refers back to the "representation or warranty" clause (specifically, it states "as each such representation or warranty would read if all qualifications as to knowledge and materiality were deleted therefrom"). That parenthetical strongly suggests that the intervening phrase "in this Agreement" also refers back to the "representation or warranty" clause, not the preceding clauses.

20

Nothing in the provision's language, subject matter, or purpose compels a contrary interpretation.[7]

46. This court accordingly interprets the indemnification provision as covering "[a]ny misrepresentation by Lifespan" to NEMC, not just any misrepresentation in the Restructuring Agreement.[8] It is worth noting, however, that the only misrepresentations that NEMC has proven in this case also constituted intentional misconduct by Lifespan, see Part III.C.ii.b, and thus would be covered by the other part of the indemnification provision, regardless of the scope of the misrepresentation clause.

47. A misrepresentation can be either intentional or negligent under Massachusetts law. Intentional misrepresentation occurs where a party makes "a false representation of material fact, with knowledge of its falsity, for the purpose of inducing [another party] to act on this representation," and the other

---

[7]It is true that, as Lifespan notes, the "covenant" clause also appears to refer to covenants in the Restructuring Agreement. But the word "covenant" already implies as much, making that a less compelling point. See, e.g., Munro v. Jordan, 2010 Mass. App. Div. 1, 1 (Mass. Dist. Ct. 2010) ("Of course, a covenant is a contract, or at least part of one.") (citing Black's Law Dictionary 391 (8th ed. 2004), which defines "covenant" to mean a "formal agreement or promise, usu. in a contract").

[8]As the parties know, this court had been leaning toward the opposite reading based on the pre-trial briefing and oral argument, but that was before reading Deerskin, which neither party had previously brought to this court's attention.

party "reasonably relie[s] on the representation as true," resulting in damages. <u>Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.</u>, 918 N.E.2d 36, 47 (Mass. 2009).

48. Negligent misrepresentation occurs where a party "in the course of [its] business . . . supplie[s] false information for the guidance of others in their business transactions, without exercising reasonable care or competence in obtaining or communicating the information," and "those others justifiably rel[y] on the information," resulting in pecuniary loss. <u>Id.</u> at 47-48 (citing <u>Nycal Corp. v. KPMG Peat Marwick LLP</u>, 688 N.E.2d 1368 (Mass. 1998)) (formatting altered).

## III. **Analysis**

This court will now analyze each of the parties' specific claims, beginning with (A) Lifespan's claim for breach of contract and then turning to the Attorney General and NEMC's counterclaims for breach of fiduciary duty and indemnification, respectively, based on Lifespan's alleged misconduct with respect to (B) NEMC's health insurer contracts, (C) the interest rate swap, (D) Lifespan's corporate overhead charges, and (E) NEMC's financial performance during the affiliation.

22

**A.** *Lifespan's breach of contract claim*

Lifespan claims that NEMC committed breach of contract by failing to make several payments required by the Restructuring Agreement. This court makes the following findings of fact and rulings of law on that claim, which result in an award of $13,903,948 in damages to Lifespan.

### i. Findings of fact

49. NEMC agreed in the Restructuring Agreement to pay Lifespan $1.83 million on or before January 2, 2006 and another $1.83 million on or before January 2, 2007. To date, NEMC has not paid Lifespan either of those sums.

50. NEMC also agreed in the Restructuring Agreement to "split on a 50/50 basis" with Lifespan "any recovery received from Medicare by NEMC . . . for the loss on sale/depreciation recapture resulting from the Affiliation."

51. On or about March 25, 2008, NEMC received a $20,487,895 million recovery from Medicare for the loss on sale/depreciation recapture resulting from the affiliation. To date, NEMC has not paid Lifespan any part of that recovery.

### ii. Rulings of law

52. The Restructuring Agreement, including each of the payment provisions just mentioned in ¶¶ 49-50, <u>supra</u>, is a valid

and binding agreement between Lifespan and NEMC. This court previously rejected NEMC's only challenges to the enforceability of those provisions (specifically, the Medicare recovery provision). See Lifespan, 731 F. Supp. 2d at 244-49. That ruling is incorporated by reference here.

53. NEMC breached the terms of the Restructuring Agreement by failing to make the January 2006 and January 2007 payments described in ¶ 49, supra. Those breaches caused Lifespan to suffer $3.66 million in actual damages, which is the sum of those two payments.

54. NEMC also breached the terms of the Restructuring Agreement by failing to pay Lifespan half of the Medicare recovery described in ¶¶ 50-51, supra. That breach caused Lifespan to suffer $10,243,948 in actual damages, which is half of the amount that NEMC recovered from Medicare.[9]

55. Combining those amounts, Lifespan is entitled to a total of $13,903,948 for NEMC's breach of the Restructuring Agreement's payment provisions.

_____

[9]One of NEMC's counterclaims, for unjust enrichment, argued that Lifespan's recovery should be reduced by the amount that NEMC spent pursuing the Medicare reimbursement. See documents no. 102, at ¶ 94, and no. 142, at 7-8. This court rejected that counterclaim as unavailable in light of the express contract. Lifespan, 731 F. Supp. 2d at 244 (citing Okmyansky, 415 F.3d at 162). NEMC has not argued that it is entitled to such a reduction under the contract itself, or on any other basis.

24

**B.** *Counterclaims relating to health insurer contracts*

NEMC and the Attorney General each seek to hold Lifespan liable for allegedly failing to meet the standard of care in negotiating NEMC's contracts with health insurance providers (also called "payors") during the affiliation. This court makes the following findings of fact and rulings of law on those claims, which result in an award of $5,857,913 in damages to NEMC and the Attorney General.

### i. Findings of fact

56. Lifespan had authority under the Affiliation Agreement to negotiate NEMC's payor contracts, which it delegated to the Lifespan Physicians Professional Services Organization ("PSO"), a joint venture between Lifespan and certain Rhode Island-based physician groups. The PSO also handled payor contracting for Lifespan's Rhode Island hospitals and their physicians. Lifespan had control over the PSO and, through it, control over NEMC's payor contracting throughout the affiliation.

57. Dr. Joel Kaufman served as the PSO's executive director and CEO throughout the affiliation. William Beyer served under him as chief operating officer ("COO"). They were both based in Rhode Island. Beyer supervised two PSO teams: one based in Rhode Island, working on payor contracting for Lifespan's Rhode Island hospitals; and the other based in Massachusetts, working

25

on payor contracting for NEMC.  Robin Junkins, a former NEMC employee who joined the PSO during the affiliation, led the Massachusetts team.[10]

58.  At the outset of the affiliation, the PSO (including Kaufman, Beyer, and Junkins) worked with NEMC officials (including CFO Mitchell Creem) to assess the past performance and current status of NEMC's existing payor contracts.  The contracts were generally found to be outdated, difficult to administer, and to have unfavorable reimbursement rates.  Also, as mentioned supra, NEMC had recently lost its contract with one of its major payors, Harvard Pilgrim, resulting in heavy losses of patient volume and revenue.

59.  NEMC's expert Kim Damokosh, an outside consultant who has helped NEMC with payor contracting since 2004, testified that the standard industry practice under such circumstances is to prepare a comprehensive written analysis of each payor contract and then a written "blueprint" to guide future negotiations, neither of which the PSO did.  This court is not persuaded, however, that such an approach actually constitutes the standard

---

[10]Lifespan paid the salaries of those employees and passed them down to NEMC and the system's other hospitals through the corporate overhead charges.  See Part III.D, infra.

26

industry practice.  Damokosh's testimony establishes only that it is her own practice.[11]

60.  NEMC generally collected about half of its revenue from commercial payors, and the other half from governmental payors, such as Medicare and Medicaid.  Because the government reimbursement rates were non-negotiable and generally insufficient to cover NEMC's costs of providing care, NEMC needed sufficient reimbursement rates and margins on its commercial business to make up the difference, in order to achieve a positive operating margin overall.[12]

61.  About 40 percent of NEMC's revenue came from the three major non-profit payors in Massachusetts:  Harvard Pilgrim, Blue Cross/Blue Shield of Massachusetts, and Tufts Health Plan (collectively, the "regional payors").  About 5 to 10 percent came from three for-profit payors with a national presence:

---

[11]Before trial, Lifespan moved in limine to exclude Damokosh's expert testimony as insufficiently reliable to satisfy Federal Rule of Evidence 702.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993); L.R. 16.2(b)(3).  This court held a hearing on that and other limine motions, see documents no. 205 and 206, and then denied it orally, allowing Damokosh to testify.  Nevertheless, in evaluating Damokosh's testimony, this court has kept in mind the arguments made in Lifespan's motion and has rejected any of Damokosh's opinions that it regards as unreliable, including those based on mere ipse dixit or speculation.

[12]That need became particularly acute when, just before the affiliation, Congress passed the Balanced Budget Act of 1997, Pub. L. 105-33, 111 Stat. 251, which significantly reduced Medicare payments to hospitals.

Cigna, United Healthcare, and Aetna (collectively, the "national payors"). Those six payors accounted for the vast majority of NEMC's commercial business.

### a. Regional payors

62. During the affiliation, the PSO focused its work for NEMC almost exclusively on renegotiating its contracts with the regional payors. As an initial priority, the PSO negotiated a new contract between NEMC and Harvard Pilgrim in 1998, restoring that relationship. The PSO also renegotiated NEMC's contracts with Blue Cross and Tufts that same year. Further contracts or amendments were negotiated with each of those payors every one or two years thereafter.

63. To prepare for negotiations with the regional payors, the PSO (specifically, Beyer and Junkins) met regularly with representatives from various NEMC departments to discuss their contracting goals and priorities, including with respect to reimbursement rates. The PSO then approached the payors and attempted to negotiate contracts that accomplished NEMC's objectives. Where necessary, Beyer and Junkins went back to NEMC's representatives to seek more input.

64. During the first half of the affiliation, Creem (NEMC's CFO) also played an active role in the regional payor negotiations. He attended some of the negotiating sessions and,

28

when he could not attend, received follow-up reports from Beyer and Junkins. He regularly discussed negotiating strategy with them and made recommendations, which they followed. Overall, he was satisfied with the progress that the PSO made, including on reimbursement rates, which steadily improved.

65. Creem left NEMC in 2000. A new CFO, Mark Scott, joined NEMC in 2001. Unlike Creem, Scott did not play an active role in payor contracting. He complained to Lifespan that the PSO was doing a poor job and that he wanted to take control of the negotiations. During 2002, the last year of the affiliation, Lifespan allowed Scott to become more involved, formally adding him to the negotiating team. But he and the PSO were unable to integrate their efforts before the affiliation ended.

66. Notwithstanding the steady improvement in NEMC's reimbursement rates, Damokosh testified that NEMC's rates and margins on its regional payor business were below industry standards. Specifically, she testified that other Boston teaching hospitals generally achieved margins of 3 to 10 percent on care reimbursed by those payors, whereas NEMC's aggregate margin on such care in fiscal year 2003 (the year after the affiliation, and the earliest year for which data is still available) was negative 2.3 percent.[13]

---

[13]The evidence relating to NEMC's payor contracts is incomplete, as not all of the contracts, financial data, and other documents were retained, and neither Beyer nor Junkins (the

67. This court is not persuaded, however, that any such deficiencies in rates or margins resulted from poor negotiating or lack of effort by the PSO. Reimbursement rates in payor contracts are driven largely by the provider's position in the marketplace, including its market share and reputation (and, likewise, by the payor's position). A provider with a bigger market share or a stronger reputation has more bargaining power with payors--and thus can usually obtain higher rates--than less prominent providers.

68. At the time of the affiliation, NEMC was one of the smallest teaching hospitals in the Boston area. And while NEMC (by Lifespan's own account) had a strong reputation, most of the other Boston teaching hospitals, including Massachusetts General Hospital, Brigham & Women's Hospital, and Beth Israel Deaconess Medical Center, had even stronger reputations. As a result, NEMC had significantly less bargaining power with the regional payors (as starkly illustrated by Harvard Pilgrim's decision to drop NEMC from its network).

69. There was little, if anything, that Lifespan could do to increase NEMC's bargaining power during the affiliation. None

two people most likely to have personal knowledge of contract details) testified at trial. Both sides argue that this court should draw an adverse inference against the other side with regard to missing evidence. But this court finds no basis for doing so. There is no indication of culpable document destruction, and either side could have called one of those witnesses to fill in any gaps.

30

of the regional payors maintained a significant presence in Rhode Island throughout that period, so Lifespan could not use its market share in Rhode Island to significantly increase NEMC's leverage with those payors in Massachusetts.[14]  And while Lifespan and NEMC were both working hard to grow a network in Massachusetts and to enhance NEMC's reputation, those were challenging, long-term objectives.

70.  Even in 2010, after more than five years of renegotiating its regional payor contracts with Damokosh's help, NEMC's reimbursement rates from those payors remained about 20 percent lower than those of most other Boston teaching hospitals. Damokosh testified that NEMC is still digging itself out of the "very deep hole" in which Lifespan left it.  But to the extent that such a hole exists, it is the result of NEMC's market position, not the PSO's performance, and existed even before the affiliation.[15]

---

[14]Blue Cross/Blue Shield of Rhode Island is a separate entity from Blue Cross/Blue Shield of Massachusetts.  Harvard Pilgrim and Tufts, while both offering coverage in Rhode Island at the outset of the affiliation, had pulled out of that state by 1999/2000.  Harvard Pilgrim paid similar rates to the Rhode Island hospitals as it paid to NEMC.

[15]Damokosh also testified that, with her help, NEMC obtained significantly higher rates from the regional payors from 2004 onward.  But this court is not persuaded that NEMC's post-affiliation rates constitute a reliable benchmark for evaluating the PSO's 1997-2002 performance, in light of changing conditions and the fact that Damokosh, by her own account, elevated NEMC's payor contracting efforts above the standard of care.

71. Although unable to command the same rates as other Boston teaching hospitals, NEMC's costs of providing care were generally comparable to, or greater than, theirs. Lifespan repeatedly urged NEMC to cut its costs, particularly during the last two years of the affiliation, but NEMC struggled to do so. Had NEMC cut its costs to a level commensurate with its market position, its margins on the regional payor business would have been significantly better.[16]

### b. National payors

72. The PSO did not renegotiate NEMC's contracts with the national payors at all during the affiliation (except in a few discrete areas, including most notably a contract with Cigna relating specifically to transplant services). Kaufman, the PSO's executive director and CEO, deemed those contracts to be less of a priority than the regional payor contracts, because the national payors accounted for a relatively small percentage of NEMC's revenue. See ¶ 61, supra.

---

[16]Because NEMC's costs varied considerably from year to year, not always moving in lockstep with its revenue, this court also is not persuaded that NEMC's aggregate margin on the regional payor contracts in fiscal year 2003 is a reliable proxy for determining its margins on each of those contracts, individually, from 1997 to 2002. Even in 2003, Damokosh acknowledged that one of NEMC's contracts, with Tufts, resulted in a positive margin of 6.1 percent.

73.  Only one of NEMC's national payor contracts, with Aetna, had inflationary increases built into its reimbursement rates for all hospital services.  NEMC's contract with Cigna did not include any inflationary increases, and its United contract generally included them only for outpatient services, not for inpatient services.  Both contracts had been negotiated in 1997, before the affiliation.  The PSO allowed the contracts to "evergreen," i.e., roll over automatically at the old rates and terms, without inflationary increases.

74.  This court finds, consistent with Damokosh's testimony, that it is standard industry practice for reimbursement rates in payor contracts to keep pace with inflation, and for providers not to allow contracts to "evergreen" at old rates without inflationary increases.  The standard inflationary increase is a blend between the medical consumer price index ("CPI") for the provider's region (here, Boston) and the lower all-item CPI.  NEMC's rates under the Aetna contract, for example, increased each year by the Boston all-item CPI plus 1 percent.

75.  With minimal effort, the PSO likely could have negotiated inflationary increases for NEMC on its Cigna and United reimbursement rates, at the same level as NEMC's Aetna increases, by the end of the affiliation's second year.[17]  Payors

_____

[17]While it usually takes less than a year to negotiate payor contracts, Damokosh acknowledged that, after the affiliation, it took NEMC (with her help) two years to complete renegotiations

33

generally do not object to inflation-only increases. Negotiating such increases from Cigna and United would not have interfered with the PSO's efforts with the regional payors or required any shift in contracting priorities, and would have increased NEMC's revenue by millions of dollars.

76. No one at NEMC ever instructed the PSO to forego seeking inflationary increases on the Cigna and United contracts, or suggested that the PSO should pursue other priorities to the exclusion of such increases. Even Lifespan's CFO acknowledged at trial that "I have difficulty saying that" it was reasonable and appropriate for the PSO not to renegotiate those contracts, and that "I have a difficult time" explaining how inflationary increases could not be deemed a priority.

77. Damokosh testified that, in addition to failing to keep pace with inflation, NEMC's national payor contracts resulted in reimbursement rates and margins that were below industry standards. Specifically, she testified that other Boston teaching hospitals generally achieved margins of 25 to 50 percent from those payors, whereas NEMC's aggregate margin from those payors in fiscal year 2003 (again, the earliest year for which data is available) was 21 percent.

with all three national payors. This court sees no reason to hold the PSO to a faster timetable.

34

78. But the only national payor contract that individually failed to achieve a 25 percent margin that year was the Cigna contract, which had a negative margin of 10.5 percent. Aetna's contract (which, again, had built-in inflationary increases) resulted in a margin of 63 percent, well above Damokosh's standard range. United's contract (which, again, had partial inflationary increases) resulted in a margin of about 39 percent, in the middle of the range.

79. Even the national payor contracts that NEMC negotiated with Damokosh's help after the affiliation failed to achieve an aggregate margin of 25 percent (as of 2007). NEMC's margins on Aetna and United business were actually lower in 2007 than in 2003. This court is not persuaded that the PSO could have significantly improved the Aetna and United rates and margins during the affiliation, aside from negotiating inflationary increases from United.[18]

80. Cigna, however, is a different matter. In addition to resulting in negative margins, NEMC's reimbursement rates from Cigna were 50 to 75 percent lower than the rates that Cigna paid to Lifespan's Rhode Island hospitals during the affiliation, even though Cigna had a relatively small market share in both states.

---

[18]Damokosh testified that NEMC obtained significantly higher rates from the national payors from 2004 onward. But this court is not persuaded that NEMC's post-affiliation rates constitute a reliable benchmark for evaluating the PSO's performance. See note 15, supra.

The PSO likely could have jointly renegotiated with Cigna on behalf of NEMC and the Rhode Island hospitals, and thereby obtained significantly higher rates for NEMC. But the PSO never attempted to do so.[19]

81. Damokosh testified, and this court finds, that it is standard industry practice for healthcare systems to jointly negotiate payor contracts on behalf of their hospitals wherever practicable, so as to maximize their leverage with payors and obtain the highest possible reimbursement rates. As discussed in Part I, supra, that was also one of the primary goals of the affiliation. No one at NEMC ever suggested that the PSO should forego joint negotiations.

82. Even without pursuing joint negotiations, the PSO likely could have obtained significantly higher rates for NEMC simply by sharing Cigna's Rhode Island rate information with NEMC and the Massachusetts team handling NEMC's payor contracts, for use in independent negotiations with Cigna (had they happened, see ¶ 72, supra). That, too, is standard industry practice within healthcare systems. The PSO failed, however, to share rate information across the system.[20]

---

[19]In contrast, the PSO generally negotiated jointly for all of Lifespan's Rhode Island hospitals.

[20]Lifespan notes that Beyer, as supervisor of both the Massachusetts and Rhode Island teams, had access to all the Rhode Island rate information. But there is no evidence that he actually accessed it, used it, or communicated it for the purpose of helping with NEMC's payor contracts.

83. This court is not persuaded, however, that joint negotiations or information sharing would have resulted in higher rates for NEMC on its United and Aetna business. Both of those payors conducted significant business in Rhode Island, but United had a much larger market share in that state (about 20 percent) and consequently paid lower rates to Lifespan's Rhode Island hospitals than to NEMC, resulting in lower margins. As to Aetna, the evidence provides no reliable basis for determining whose rates were higher.

### c. Physician groups

84. The PSO did not negotiate payor contracts for NEMC's physician groups either. While it is common in the healthcare industry for hospitals and physicians to negotiate jointly with payors (as the PSO did for Lifespan's Rhode Island hospitals and their physicians), NEMC's physician groups had traditionally negotiated their contracts separately from the hospital, and continued doing so throughout the affiliation, using their own contracting specialist.

85. The physician groups preferred separate negotiations because they were independent-minded and wanted to retain control over their revenue streams. They also lacked confidence in NEMC's or the PSO's ability to achieve better results than their own specialist. According to Dr. Thomas O'Donnell, who was

37

NEMC's CEO and also a member of one of its physician groups, "there was a significant amount of antipathy towards Lifespan among the physician population."

86. NEMC's physicians groups generally achieved poor results on their payor contracts throughout the affiliation. Their reimbursement rates from the national and regional payors were at or near the bottom of the market in the Boston area. As a result, NEMC had to pay or loan more than $15 million to the physician groups each year to prevent a mass exodus of physicians from the hospital.

87. Lifespan likely could have forced NEMC's physician groups to negotiate jointly with the hospital through the PSO, because NEMC controlled two-thirds of the seats on the board of the New England Health Care Foundation, Inc. ("Foundation"), which was then the sole controlling member of the physician groups. Lifespan, in turn, exercised control over NEMC, as discussed in Part I.A, supra.[21]

88. The Affiliation Agreement, however, provided as follows with respect to Lifespan's relationship with NEMC's physician groups:

> Lifespan shall continue the successful and productive
> relationship that currently exists among [NEMC], the

_____

[21]After the affiliation, NEMC persuaded the Foundation to make NEMC its sole member, in exchange for forgiving about $11 million in loans owed by the physician groups to NEMC. NEMC and the physician groups have since negotiated payor contracts jointly.

38

[Foundation], and the NEMC physician practice groups to enhance the ability of all of these organizations to achieve their mission and promote their economic viability. <u>Lifespan acknowledges that there are significant financial and operational arrangements currently in place among [those entities] and shall move forward with these arrangements</u> with due recognition of the importance they play in supporting the academic, teaching and other missions of all the entities. Consistent with this understanding and with current practice, <u>adjustments in such arrangements shall be made only after significant consultation and meaningful input from the physician groups affected and Tufts</u>.

(Emphases added.)[22]

89. Lifespan never approached the physician groups to request or recommend any adjustments in the traditional operational arrangement for separate payor contracting by NEMC and its physician groups. Nor did the physician groups ever approach Lifespan to request any adjustments in that arrangement, or express to Lifespan or NEMC any interest in jointly negotiating contracts with the hospital.

### i. Rulings of law

#### a. Attorney General's breach of fiduciary duty claim

90. This court has already ruled that Lifespan owed a fiduciary duty to NEMC during the affiliation. <u>See</u> <u>Lifespan</u>, 731 F. Supp. 2d at 238-41. Lifespan specifically owed a fiduciary

_____

[22]Neither the Foundation nor the practice groups were parties to the Affiliation Agreement, the Restructuring Agreement, or this litigation.

duty to NEMC with regard to payor contracting, by virtue of the control that Lifespan (through the PSO) exercised over NEMC in that area and the "faith, confidence, and trust" that NEMC placed in Lifespan's judgment and advice. Id. (quoting Harbor Schools, 843 N.E.2d at 1064).

91. The Attorney General argues, first, that Lifespan breached its fiduciary duty of care to NEMC by failing to comprehensively assess NEMC's existing payor contracts at the outset of the affiliation. But the PSO conducted a reasonable, good-faith assessment of that sort, with NEMC's assistance. See ¶¶ 58-59, supra. The Attorney General has not met her burden of proving that Lifespan departed from the standard of care in that regard.

92. The Attorney General argues, next, that Lifespan breached its fiduciary duty of care to NEMC by failing to negotiate sufficient rates and margins from the regional payors. But the PSO made a reasonable, good-faith effort throughout the affiliation to negotiate better rates from those payors, with some success. See ¶¶ 62-71, supra. While the PSO may not have been the strongest negotiator, the Attorney General has not met her burden of proving that Lifespan departed from the standard of care in that regard either.

93. This court agrees with the Attorney General, however, that Lifespan breached its fiduciary duty of care to NEMC by

40

failing to renegotiate NEMC's Cigna and United contracts to obtain inflationary increases in their reimbursement rates by the end of the affiliation's second year and annually thereafter. See ¶¶ 72-76, supra. Those failures constituted "clear and gross" departures from the standard of care that any reasonable party in Lifespan's position would have exercised. BCHF, 73 F.3d at 433 (citing Spiegel, 8 N.E.2d at 904).

94. This court also agrees with the Attorney General that Lifespan breached its fiduciary duty of care to NEMC by failing to negotiate jointly with Cigna on behalf of NEMC and the Rhode Island hospitals, and failing to share Cigna's Rhode Island rate information with NEMC and the PSO's Massachusetts team. See ¶¶ 80-82, supra. Those, too, were "clear and gross" departures from the standard of care that any reasonable party in Lifespan's position would have exercised. BCHF, 73 F.3d at 433 (citing Spiegel, 8 N.E.2d at 904).

95. The Attorney General argues that Lifespan also breached its fiduciary duty of care by failing to jointly negotiate with Aetna, United, and the regional payors. But joint negotiations with those payors likely would not have been helpful to NEMC or resulted in higher reimbursement rates. See ¶¶ 69, 83, supra. The Attorney General has not met her burden of proving that Lifespan departed from the standard of care in that regard, or, even if it did, that it caused any damages to NEMC.

41

96.  The Attorney General also argues that Lifespan breached its fiduciary duty of care to NEMC by failing to negotiate sufficient rates and margins from the national payors.  This court agrees as to Cigna, which paid unreasonably low rates that resulted in negative margins.  See ¶¶ 93-94, supra.  As to Aetna and United, however, NEMC's rates and margins were within a reasonable range.  See ¶¶ 78-79, 83, supra.  Lifespan did not depart from the standard of care in that regard (except in failing to negotiate inflationary increases from United, see ¶ 93, supra).[23]

97.  Finally, the Attorney General argues that Lifespan breached its fiduciary duty of care by failing to negotiate on behalf of NEMC's physician groups.  This court rules, however, that Lifespan made a reasonable, good-faith decision to maintain the traditional arrangement of separate payor contracting by NEMC and its physician groups, which reflected their reasonable preference.  See ¶¶ 84-85, 88-89, supra.  The Attorney General has not met her burden of proving that Lifespan departed from the standard of care in that regard.

---

[23]The fact that United's rates were otherwise reasonable does not prevent Lifespan from being held liable for failing to negotiate inflationary increases, because those increases were easily attainable, and Lifespan violated the standard of care in failing to obtain them.  Simply put, Lifespan left millions of dollars on the table in inflationary adjustments because of its gross negligence.

98. Lifespan's breaches of fiduciary duty, see ¶¶ 93-94, 96, supra, were the "but-for" and proximate cause of damages to NEMC. They foreseeably prevented NEMC from obtaining higher reimbursement rates from Cigna and United, and thereby resulted in NEMC's receiving significantly less revenue from those payors during the affiliation.

99. As to United, Lifespan's breach of fiduciary duty caused NEMC to suffer actual damages in the amount of $2,699,109, which is the amount of additional revenue that NEMC likely would have collected from United during the affiliation if Lifespan had negotiated inflationary increases in United's reimbursement rates by the end of the affiliation's second year, and annually thereafter, based on the Boston all-item CPI plus 1 percent (NEMC's Aetna inflation rate). See Appendix.

100. As to Cigna, Lifespan's breach of fiduciary duty included not only a failure to negotiate inflationary increases, but also a failure to negotiate jointly with the Rhode Island hospitals and to share Cigna's Rhode Island rate information, either of which likely would have resulted in further rate increases for NEMC. See ¶¶ 80, 82, supra. This court therefore concludes that it is appropriate to use the full Boston medical CPI to calculate the Cigna damages, rather than the lower CPI blend used to calculate the United damages.[24]

_____

[24]It is possible that joint negotiations or information-sharing would have resulted in Cigna rate increases even beyond

101. As to Cigna, then, Lifespan's breaches of fiduciary duty caused NEMC to suffer actual damages in the amount of $3,158,804, which is the amount of additional revenue that NEMC likely would have collected from Cigna during the affiliation if Lifespan had negotiated inflationary increases in Cigna's reimbursement rates by the end of the affiliation's second year, and annually thereafter, based on the Boston medical CPI. See Appendix.

102. Combining the Cigna and United damages, the Attorney General is entitled to recover a total of $5,857,913 for Lifespan's breaches of fiduciary duty in the area of payor contracting, which is the amount necessary to put NEMC "in the position [it] would have been in if no breach of fiduciary duty had been committed." Berish, 770 N.E.2d at 977.

### b. NEMC's indemnification claim

103. As discussed in Part II.C.i, supra, Lifespan agreed in the Restructuring Agreement to "indemnify NEMC for any losses it incurs that result directly and solely . . . from Lifespan's willful misconduct or gross negligence in the provision of services to NEMC by Lifespan employees working under the

the Boston medical CPI, but this court is not prepared to deem such increases likely based on the evidence at trial. In any event, the Attorney General and NEMC have not provided a reliable basis for measuring damages beyond that level. The medical CPI, while possibly on the conservative end, is a reliable and reasonable measure.

44

supervision and direction of Lifespan employees during the Affiliation Period."

104. The individuals responsible for overseeing NEMC's payor contracting during the affiliation (including Kaufman, Beyer, and Junkins) were Lifespan employees working under the supervision and direction of Lifespan employees, and were providing services to NEMC. See ¶¶ 57-58 & n.10, supra. Lifespan has not argued otherwise.

105. Lifespan was grossly negligent in failing to renegotiate the Cigna and United contracts to obtain inflationary increases in their reimbursement rates, in failing to jointly negotiate with Cigna on behalf of NEMC and the Rhode Island hospitals or to share Cigna's Rhode Island rate information across the system, and in failing to obtain sufficient rates and margins from Cigna. See ¶¶ 93-94, 96, supra.

106. NEMC argues that Lifespan was also grossly negligent in all of the other respects that the Attorney General argued in connection with her breach of fiduciary claim. But, for the reasons already discussed, this court rules that NEMC has not proven gross negligence in any of those other respects. See ¶¶ 91-92, 95-97, supra.

107. Lifespan's gross negligence directly and solely caused NEMC to incur $5,857,913 in losses. See ¶¶ 102, supra. Lifespan argues that those losses were not "solely" caused by its gross

45

negligence because NEMC, too, was involved in payor contracting. But NEMC played no role in Lifespan's failures to negotiate with Cigna and United or to use the system's leverage in negotiating with Cigna.  See ¶¶ 76, 81, supra.  Those failures were Lifespan's alone.

## C. *Counterclaims relating to interest rate swap*

NEMC and the Attorney General each seek to hold Lifespan liable for alleged misconduct in connection with a complex financial transaction, known as an interest rate swap, that NEMC executed during the last year of the affiliation.  This court makes the following findings of fact and rulings of law on those claims, which result in an award of $8,318,791 in damages to NEMC and the Attorney General.

### i.  Findings of fact

108.  In 1992, NEMC issued more than $100 million in revenue bonds to finance a major building project.  The bonds were callable in July 2002.  In the years leading up to that date, interest rates dropped significantly from the rate at which the bonds had been issued, creating a potential opportunity for NEMC to refinance the bonds at a lower rate.  Lifespan and NEMC both recognized that opportunity.

46

109. About a year before the call date, Lifespan's CFO David Lantto arranged for representatives of Morgan Stanley, a financial services firm, to present a bond refinancing proposal to NEMC. Morgan Stanley proposed that NEMC refinance the bonds in July 2002, using Morgan Stanley as underwriter. In the meantime, Morgan Stanley proposed that NEMC enter into an interest rate swap, which it claimed would enable NEMC to "lock in" the current low interest rate and "protect" against any rate increases before the refinancing date.

110. The proposed swap worked as follows: NEMC would agree to pay Morgan Stanley a fixed interest rate, and Morgan Stanley would agree to pay NEMC a variable interest rate (based on a swap rate index), on a notional amount roughly equal to the amount of NEMC's bonds. Upon termination of the swap, whichever party had the higher balance would pay the difference. Thus, if the variable rate went up, Morgan Stanley would make a payment to NEMC. Conversely, if the variable rate went down, NEMC would make a payment to Morgan Stanley.

111. Under ordinary conditions, where the swap rate index moved roughly in tandem with the refinancing rate available to NEMC, the swap would offset any movements in the refinancing rate and effectively enable NEMC to "lock in" the current rate (minus Morgan Stanley's $1.6 million transaction fee, which was built into the swap). But if the swap rate index "decoupled" from that

refinancing rate, NEMC would not actually "lock in" the current rate; it would be at risk of paying more, or receiving less, in the swap than the amount necessary to offset changes in the refinancing rate.

112. Morgan Stanley mentioned that risk of decoupling (known as "basis risk" or "swap spread risk") to NEMC, but only in passing, and not in a way that enabled NEMC to fully understand the nature and scope of the risk. After the affiliation, NEMC asserted a claim against Morgan Stanley for failing to fully disclose the swap's risks. They settled the claim in June 2005 for $2.25 million. The settlement agreement stated that Morgan Stanley was not admitting liability and was settling "solely for reasons of economy."

113. Before Morgan Stanley's proposal, NEMC had never entered into an interest rate swap or seriously considered one, either in conjunction with a bond refinancing or otherwise. As with many non-profit organizations, NEMC's board and management were conservative and ordinarily not inclined to enter into complex financial transactions of that sort. The idea for the swap came from Morgan Stanley broker Jeff Seubel, who suggested it to Lantto, who in turn suggested it to NEMC.

114. Unbeknownst to NEMC, Lantto had a close, longstanding personal friendship with Seubel. Lantto had worked with Seubel in the past, and Seubel had recommended Lantto for the CFO

48

position that Lantto held before coming to Lifespan. Their business relationship had developed into a friendship because of their mutual affinity for wine. They had gone to wine tastings together, bought dinner and wine for each other on numerous occasions, and stayed overnight at each other's homes. Seubel was also part of a wine-related business partnership that Lantto wanted, but had never been invited, to join.

115. Lifespan's own corporate policies, including its conflict of interest policy and its meals/gifts policy, required Lantto to fully disclose his personal relationship with Seubel and offer to recuse himself from the proposed transaction with Morgan Stanley. Lantto knew of those policies and requirements, on which he had received training, but nevertheless failed to disclose the personal relationship to NEMC, recuse himself, or offer to do so.

116. In a report prepared after the affiliation, Lifespan's compliance officer and internal audit director Thomas Igoe found, based on an internal investigation, that Lantto "should have recused himself from the process [of considering the swap] or more fully disclosed his friendship" with Seubel and that his failure to do so put his "independence" in question and gave "the appearance of conflict via preferential access." Igoe found that Lantto and Seubel "needed to maintain a relationship beyond reproach; they have not."

49

117. This court agrees with those findings and further finds that Lantto not only appeared to have, but actually had, a conflict of interest in the swap transaction, which resulted in preferential access for Morgan Stanley. Lantto introduced Morgan Stanley to NEMC, and then pressured NEMC to enter into the swap, taking the steps described in ¶¶ 118-123, infra, all for the purpose of pleasing his friend Seubel, strengthening their personal relationship, returning past favors, and likely also in hopes of being invited to join Seubel's wine partnership. He did so in knowing disregard of NEMC's interests.

118. NEMC's CFO, Mark Scott, strongly opposed the swap, in part because it was a complex transaction and difficult to understand or assess. In an attempt to better understand it, he requested Lantto's permission to engage an independent financial advisor, Chris Payne of the firm Ponder & Co., for a second opinion on Morgan Stanley's proposal, explaining that he had worked with Payne in the past and had confidence in his judgment. Lantto denied that request.[25]

119. Lantto thereafter insisted that NEMC engage a less expensive financial advisor of his choosing, Public Financial Management ("PFM"), to prepare a fairness opinion on the swap. PFM did not provide its fairness opinion until February 2002,

---

[25]This is one of many examples of Lifespan's control over NEMC during the affiliation, including with respect to the interest rate swap. See Lifespan, 731 F. Supp. 2d at 238-41; ¶ 9, supra, and ¶ 135, infra.

50

after NEMC had already entered into the swap. The opinion was too late to be of any use to NEMC. Before providing that opinion, PFM participated in some conference calls regarding the swap, but did not give NEMC any significant advice regarding its risks.

120. Scott also requested that Lantto arrange for competitive bidding against Morgan Stanley by other financial firms. Lantto denied that request as well, explaining that he had worked with Morgan Stanley in the past and could vouch for their competence (but, again, not disclosing his personal relationship with Seubel). As a result of Lantto's decision, NEMC received no competing proposals before entering into the swap with Morgan Stanley.

121. Scott informed Lantto and various NEMC officials, early in the process of considering the swap, that he strongly opposed doing it. Lantto pressured him not to continue raising strong objections. Lantto also expressed disapproval when Scott renewed his request for a second opinion from Ponder & Co. Because Lantto was his superior, see ¶ 12, supra, and because Scott had just joined NEMC that year, he acquiesced to that pressure, toning down his opposition to the swap.

122. NEMC officials relied heavily on Lantto's advice in deciding whether to enter into the swap, perceiving him as a financial expert. Lantto understood the potential risks of the

swap, including basis risk (albeit not by that name), but never discussed those risks with NEMC officials or expressed any concerns about the swap.  He spoke only of the swap's potential benefits, reiterating Morgan Stanley's claim that it would "lock in" the current interest rate.[26]

123.  At Lantto's urging, NEMC approved the swap in late 2001.  Lantto personally attended the relevant finance committee and board meetings at NEMC.  His presence at those meetings was unusual and reasonably understood by NEMC officials as an implicit endorsement of the swap.  Lantto then personally presented the swap to Lifespan's finance committee and board, which also approved it, clearing the way for NEMC to enter into the swap.  NEMC executed the swap contract with Morgan Stanley in January 2002.

124.  Less than a month later, a group of Lifespan's Rhode Island hospitals rejected a very similar swap proposal presented by Morgan Stanley.  Those hospitals were contemplating a new bond issuance, rather than a refinancing.  They decided that, in light of their poor credit rating and resulting uncertainty about whether they would be able to arrange acceptable bond financing

---

[26]Lantto, who testified by deposition, denied using the phrase "lock in," acknowledging that it was inaccurate.  But NEMC officials recalled his saying it, and contemporaneous NEMC board meeting minutes expressly state that "Lantto . . . asked the board to ratify . . . the locking in of December interest rates through a hedging mechanism."  This court finds that Lantto likely did use that phrase.

that year, the swap was "too risky."  Lantto, having already pressured NEMC into its swap, did not apply the same pressure to the Rhode Island group.

125.  Under the contract with Morgan Stanley, NEMC's swap was scheduled to terminate in July 2002, simultaneously with NEMC's anticipated bond refinancing.  Morgan Stanley projected that, if interest rates moved as expected over the next six months, the swap would result in savings to NEMC of $10,604,144 on the bond refinancing, relative to NEMC's existing payment obligations on the original bonds.

126.  After NEMC signed the contract, however, interest rates unexpectedly moved in a direction adverse to NEMC's swap position.  That movement included a decoupling of the swap rate index from NEMC's available refinancing rate.  See ¶ 111, supra.  By July 2002, as a result of that adverse rate movement, NEMC's projected savings on the bond refinancing had dropped by nearly half, to $5.73 million.

127.  If NEMC had terminated the swap at that point, it would have been required to make a large payment to Morgan Stanley.  See ¶ 110, supra.  That payment, if not folded into a simultaneous bond refinancing, would have been classified as an operating loss for accounting purposes and consequently would have put NEMC at risk of defaulting on its bond covenants, which would have caused a host of other problems.

53

128. NEMC expressed to Morgan Stanley its unhappiness with the swap's performance and the now-apparent basis risk. Morgan Stanley, still seeking to serve as NEMC's underwriter in the bond refinancing, advised NEMC that it expected interest rates to move in NEMC's favor soon. Based on that advice, NEMC decided, with approval from Lifespan and Lantto (who still had not disclosed his conflict of interest), to extend the swap beyond July 2002, and delay the refinancing.

129. After the extension, however, interest rates moved in a direction even further adverse to NEMC's swap position. In August 2002, as Lifespan and NEMC moved closer to disaffiliation, Lantto distanced himself from the transaction, telling Scott to take the lead. NEMC then engaged Ponder & Co., the consultant that Scott had wanted to engage earlier, to present options with regard to the swap and refinancing.

130. Based on Ponder's advice, NEMC decided to refinance the bonds with Merrill Lynch as underwriter, rather than Morgan Stanley, which it fired. NEMC terminated the swap with Morgan Stanley in November 2002 and refinanced the bonds through Merrill Lynch. In the end, NEMC saved only $681,209 on the refinancing, relative to its existing bond payment obligations. NEMC made a payment of $8.954 million to Morgan Stanley under the swap, which was folded into the refinancing.

54

131.  If not for his friendship with Seubel, Lantto never would have arranged for Morgan Stanley (or any other firm) to present a swap proposal to NEMC, or pressured NEMC to enter into a swap.  NEMC, in turn, never would have entered into a swap.  Instead, NEMC likely would have refinanced its bonds in July 2002 at then-prevailing interest rates.  That would have resulted in present value savings to NEMC of $11.25 million.[27]

132.  If Lantto had arranged for Morgan Stanley to present the swap proposal, but then disclosed his conflict of interest to NEMC and recused himself from the transaction, Scott would have opposed the swap more openly and forcefully, likely with the backing of his chosen consultant.  Without Lantto there to counter Scott's view and push the transaction through, NEMC likely never would have entered into a swap, and instead would have refinanced the bonds in July 2002.

133.  Regardless of whether Lantto disclosed his conflict of interest or recused himself, NEMC would not have entered into the swap, and likely would have refinanced the bonds in July 2002, if Lantto had discussed with NEMC the potential risks of the swap, including its basis risk, rather than speaking only of its

---

[27]There is also a possibility, though not a likelihood, that NEMC would have conducted an "advance refunding" of the bonds, refinancing them in advance of July 2002 to truly lock in the current interest rate.  That can only be done once during the life of the bonds.  An advance refunding would have resulted in present value savings to NEMC of $8.538 million, after accounting for negative arbitrage.

55

benefits and falsely stating to NEMC that the swap would "lock in" current interest rates. See ¶ 122, supra.

134. Foregoing the swap would have left NEMC at risk of potential interest rate increases after January 2002, but also would have left open the possibility of beneficial rate reductions (which actually happened), would not have required NEMC to pay a $1.6 million transaction fee to Morgan Stanley, see ¶ 111, supra, and would not have created the risk of a large swap payment that, if not folded into a simultaneous bond refinancing, could cause NEMC to default on its bond covenants, see ¶¶ 110, 127, supra. On balance, foregoing the swap would have been the better course for NEMC.


## ii. Rulings of law

### a. Attorney General's breach of fiduciary duty claim

135. This court has already ruled that Lifespan owed a fiduciary duty to NEMC during the affiliation. See Lifespan, 731 F. Supp. 2d at 238-41. Lifespan specifically owed a fiduciary duty to NEMC with regard to the interest rate swap and bond refinancing, by virtue of the control that Lifespan exercised over those matters and the "faith, confidence, and trust" that NEMC placed in Lifespan's judgment and advice. Id. (quoting Harbor Schools, 843 N.E.2d at 1064).

136. Lifespan breached its fiduciary duty to NEMC when Lantto, its CFO,[28] knowingly gave Morgan Stanley preferential access to NEMC, concealed from NEMC his personal relationship with Seubel, failed to recuse himself from the proposed swap transaction, pressured NEMC to enter into the swap, prohibited competitive bidding, prohibited NEMC from obtaining a timely second opinion from its chosen consultant, suppressed opposition from NEMC's CFO, advocated the swap to NEMC without discussing its risks, and falsely stated to NEMC that the swap would "lock in" current interest rates.

137. Each of those acts and omissions was done knowingly by Lantto for the purpose of advancing his self-interest, and in knowing disregard of NEMC's interests. See ¶ 117, supra. Lantto failed, in each instance, to exercise "utmost good faith" toward NEMC. Harbor Schools, 843 N.E.2d at 1064-65. Each of those acts and omissions therefore constituted a breach of his--and Lifespan's--duty of loyalty to NEMC. See, e.g., Demoulas, 677 N.E.2d at 179 (duty of loyalty requires fiduciary "to act with

---

[28]"Under ordinary principles of agency," a corporation "is vicariously liable for the tortious conduct of its employee committed within the scope of his employment." Kourouvacilis v. Am. Fed'n of State, County & Mun. Emps., 841 N.E.2d 1273, 1283 (Mass. App. Ct. 2006) (citing Worcester Ins. Co. v. Fells Acres Day Sch., Inc., 558 N.E.2d 958, 967 (Mass. 1990)).

absolute fidelity"); <u>Donahue</u>, 328 N.E.2d at 515 (fiduciary "may not act out of . . . self-interest").[29]

138.  Lifespan argues that a fiduciary has no duty to disclose a conflict of interest unless non-disclosure would unjustly enrich the fiduciary.  But "the circumstances creating such fiduciary obligations as a duty to disclose are varied," and not subject to any "universally-applicable rule."  <u>Geo. Knight & Co. v. Watson Wyatt & Co.</u>, 170 F.3d 210, 216 (1st Cir. 1999) (citing Massachusetts cases).  The touchstone is whether the fiduciary's "failure to make disclosure would be inequitable."  <u>Id.</u>  Here, Lantto's knowing concealment of his conflict of interest was inequitable and disloyal to NEMC, regardless of whether it unjustly enriched him.

139.  Moreover, even if unjust enrichment were required, that requirement would be satisfied here.  Lantto had not only a personal interest in the swap, but also a financial interest, in that he wanted to join Seubel's wine partnership and likely hoped the swap would help make that happen.  <u>See</u> ¶ 117, <u>supra</u>.  That made his conduct a form of unjust enrichment and self-dealing.  Under such circumstances, "to satisfy the duty of loyalty, a fiduciary . . . must disclose details of the transaction and the

---

[29]During closing argument, Lifespan argued that Lantto's conduct was "not unusual" and is the sort of thing that "happens all of the time" in the business community.  But that assertion is not supported by the evidence and, in any event, would not excuse knowingly disloyal behavior by a fiduciary.

conflict of interest to the corporate decisionmakers" so that they can make an informed and independent judgment. Demoulas, 677 N.E.2d at 181; BCHF, 73 F.3d at 433-34.

140. Lifespan's breaches of fiduciary duty, see ¶¶ 136-137, supra, were the "but-for" and proximate cause of damages to NEMC, in that they foreseeably caused NEMC to enter into the swap and suffer damages, which it otherwise would not have done, see ¶¶ 131-133, supra, and they were a substantial factor at every stage of the decision-making process.

141. Lifespan's breach of fiduciary duty caused actual damages to NEMC in the amount of $10,568,791, which is the difference between what NEMC likely would have saved on a July 2002 bond refinancing had it not entered the swap ($11.25 million), and the amount that it actually saved as a result of the swap ($681,209). See ¶¶ 130-131, supra. That is the amount necessary to put NEMC "in the position [it] would have been in if no breach of fiduciary duty had been committed." Berish, 770 N.E.2d at 977.

142. Lifespan argues that NEMC's damages should be measured relative to what it would have saved had it terminated the swap as scheduled in July 2002 ($5.73 million), rather than extending it through November 2002, which would reduce NEMC's damages by nearly half, to $5.52 million. See ¶ 126, supra. But NEMC extended the swap based on Morgan Stanley's advice and with

59

Lantto's approval, at a time when Lantto's conflict of interest remained undisclosed, and Morgan Stanley was still seeking, with Lantto's support, to serve as NEMC's bond underwriter. See ¶ 128, supra.

143. NEMC's decision to extend the swap was a reasonable and foreseeable response to the dilemma in which it found itself as a result of Lifespan's breach of fiduciary duty, and which it otherwise would not have faced. Cutting off NEMC's damages as of July 2002 would not result in full and fair compensation. Cf., e.g., Rattigan v. Wile, 841 N.E.2d 680, 690 (Mass. 2006) (explaining that "the appropriate inquiry" in assessing damages incurred in an attempt to mitigate "is whether, in the circumstances, the cost incurred . . . was a reasonable response to the defendant's behavior," not whether the response "actually succeeded in its purpose").

144. Finally, the Attorney General and NEMC concede, without objection from Lifespan, that the swap damages should be reduced by the $2.25 million payment that NEMC already received under its settlement agreement with Morgan Stanley. See document no. 210, at 25.[30] After making that adjustment, the amount of

---

[30]This concession appears to be based on Massachusetts's Uniform Contribution Among Tortfeasors Act, which provides that "[w]hen a release . . . is given in good faith to one of two or more persons liable in tort for the same injury, . . . it shall reduce the claim against the others . . . in the amount of the consideration paid for it." Mass. Gen. L. ch. 231B, § 4; DeLuca v. Jordan, 781 N.E.2d 849, 858 (Mass. App. Ct. 2003) (explaining that breach of fiduciary duty is a tort covered by that statute).

damages to which the Attorney General is entitled for Lifespan's breach of fiduciary duty is $8,318,791.

### b. NEMC's indemnification claim

145. As discussed in Part II.C.i, <u>supra</u>, Lifespan agreed in the Restructuring Agreement to "indemnify NEMC for any losses it incurs that result directly and solely . . . from Lifespan's willful misconduct or gross negligence in the provision of services to NEMC by Lifespan employees working under the supervision and direction of Lifespan employees during the Affiliation Period."

146. Lantto was a Lifespan employee working under the supervision and direction of Lifespan employees during the affiliation when he provided services to NEMC relating to the refinancing and swap.

147. Lantto's conduct relating to the swap which constituted a breach of fiduciary duty, <u>see</u> ¶¶ 136-137, <u>supra</u>, also constituted willful misconduct, in that Lantto's acts and omissions were intentional and carried a "great chance" of harm to NEMC. <u>Dillon's Case</u>, 85 N.E.2d at 74.

148. Lantto's willful misconduct resulted directly and solely in NEMC's suffering an actual loss of $8,318,791, after accounting for the settlement with Morgan Stanley, which reduced NEMC's actual loss. <u>See</u> ¶¶ 141, 144, <u>supra</u>.

61

149. Lifespan argues that Lantto's misconduct cannot be deemed the sole cause of NEMC's loss, because Morgan Stanley also contributed to that loss, as evidenced by its settlement with NEMC. But NEMC never would have even considered the swap if not for Lantto's misconduct, see ¶ 131, supra, and, even having considered it, never would have approved it, regardless of what Morgan Stanley did. See ¶¶ 132-133, supra. So Lantto's misconduct solely and independently caused the loss.

150. Lifespan argues that the word "solely" requires NEMC to exclude any and all other causes. But, as Justice Holmes wrote while sitting on the Massachusetts Supreme Judicial Court, if a defendant were "exonerated because other causes co-operate" with its own misconduct, then "it never would be liable." Hayes v. Town of Hyde Park, 27 N.E. 522, 523 (Mass. 1891). This court rejects Lifespan's reading as an unreasonable attempt to render the indemnification provision meaningless.

151. Moreover, even if this court accepted Lifespan's reading, NEMC would still be entitled to indemnification under the other part of the indemnification provision, in which Lifespan agreed to indemnify NEMC from any losses "incurred or suffered by [NEMC] as a result of, arising out of or directly or indirectly relating to . . . [a]ny misrepresentation by Lifespan." See Part II.C.ii, supra.

62

152. Lantto misrepresented to NEMC officials that the interest rate swap would enable NEMC to "lock in" the then-current interest rate, which he knew was false. See ¶ 122, supra. He made that misrepresentation for the purpose of inducing NEMC's reliance (i.e., to induce NEMC to enter into the swap based on that purported "lock in" feature), and NEMC reasonably did so rely, resulting in damages to NEMC. See ¶ 133, supra.

153. A knowing concealment of material information by one who has a duty to disclose that information also constitutes a misrepresentation under Massachusetts law. See, e.g., First Marblehead Corp. v. House, 473 F.3d 1, 9-10 (1st Cir. 2006) (citing Fox v. F & J Gattozzi Corp., 672 N.E.2d 547, 550-51 (Mass. App. Ct. 1996), Swinton v. Whitinsville Sav. Bank, 42 N.E.2d 808 (Mass. 1942), and Restatement (Second) of Torts § 551(1) (1977)).

154. Lantto knowingly concealed from NEMC officials his conflict of interest in the swap transaction and bond refinancing, which was a material fact that he had a duty to disclose, by virtue of Lifespan's fiduciary relationship with NEMC. See ¶¶ 136-139, supra. He concealed that fact for the purpose of inducing NEMC's reliance on his presumed lack of conflict, and NEMC reasonably did so rely, resulting in damages. See ¶¶ 131-133, supra.

155. As a direct result of each of Lantto's misrepresentations, NEMC suffered an actual loss of $8,318,791, after accounting for the settlement with Morgan Stanley. See ¶¶ 141, 144, supra. There is no requirement, under the misrepresentation clause of the indemnification provision, that NEMC's loss be caused "solely" by Lifespan's misrepresentation; in fact, the loss need only "directly or indirectly relat[e] to" the misrepresentations. That standard is easily satisfied here.

## D. *Counterclaims relating to corporate overhead charges*

NEMC and the Attorney General each seek to hold Lifespan liable for alleged misconduct relating to the corporate overhead expenses that Lifespan charged to NEMC on an annual basis throughout the affiliation. This court makes the following findings of fact and rulings of law on those claims, which result in no liability for Lifespan.

### i. Findings of fact

156. NEMC agreed in the Affiliation Agreement to pay its share of Lifespan's corporate overhead expenses, on a "budget neutral basis." Lifespan's other hospitals were also responsible for paying their respective shares. Corporate overhead expenses included, for example, executive compensation (for Lifespan and hospital officials), information technology, payor contracting,

financial services, purchasing, legal services, risk management, public relations, and marketing.

157. During the affiliation, Lifespan charged, and NEMC paid, corporate overhead fees in the following amounts:

- $10,301,000 for fiscal year 1998 (pro-rated because NEMC joined the system toward the end of that year);

- $35,875,000 for fiscal year 1999;

- $36,416,000 for fiscal year 2000;

- $40,201,000 for fiscal year 2001;

- $43,075,000 for fiscal year 2002; and

- $6,612,000 for fiscal year 2003 (pro-rated because NEMC left the system early that year).

158. Lifespan's corporate overhead charges were generally based on its budget projections for each fiscal year. Lifespan attempted to make budget projections that would equal its actual expenses. In most years of the affiliation, Lifespan's actual expenses turned out to be lower than the budget projections. In fiscal year 1999, however, the expenses were higher. Overall, during the affiliation Lifespan spent about $10 million less than it budgeted systemwide.

159. There was generally no reconciliation, or "true-up," at the end of the year between Lifespan's budget-based corporate overhead charges and its actual expenses.[31] Lifespan used budget

_____

[31]On one occasion, however, at NEMC's request, Lifespan deferred a $500,000 budgeted expense from 2001 to 2002, when it was actually incurred.

projections as the basis of its overhead charges to avoid having to devote time and resources to reconciliation. That began to change during the last year of the affiliation (2002), when Lifespan began using actual expenses for certain costs directly associated with particular hospitals. See ¶ 163, infra (discussing allocation among hospitals).

160. Lifespan took its actual expenses into account, however, when making budget projections for the following fiscal year. Thus, when the actual expenses were lower than the budget projections, it generally had the effect of reducing the next year's budget and, in turn, reducing the next year's corporate overhead charges. That happened, for example, in fiscal year 2000, after Lifespan used much less of its medical malpractice reserves than projected in fiscal year 1999.

161. Despite spending less than budgeted, Lifespan's corporate services had an operating loss nearly every year of the affiliation, and an overall operating loss of about $11 million during that period. Even after accounting for non-operating income, Lifespan had a net loss in half of the fiscal years during the affiliation and essentially broke even overall (except for a $5.7 million net gain in fiscal year 1999, which resulted largely from the malpractice savings).

162. This court is not persuaded that Lifespan's use of budget projections, rather than actual expenses, to determine

corporate overhead charges prevented those charges from being "budget neutral." Lifespan saved money in some years, but lost money in other years. There is no reliable basis for concluding that the savings and losses would not have balanced out over the long run. Nor is there any reliable evidence that Lifespan's budget-based approach departed from standard industry practice among healthcare systems.[32]

163. Lifespan used several different methods to determine each hospital's share of the corporate overhead. Certain costs directly associated with a particular hospital (e.g., salaries for each hospital's on-site corporate staff) were charged to that hospital only. Most costs, however, were allocated among the hospitals based on their relative revenue. NEMC accounted for roughly one-third of the system's revenue and consequently paid about one-third of the overhead each year.

164. During the first half of the affiliation, NEMC and the Rhode Island hospitals regularly discussed those allocation methods with Lifespan and raised objections to allocations that they considered unfair.[33] Lifespan carefully considered their

_____

[32]Indeed, that approach likely reduced NEMC's charges overall, by putting the risk of cost overruns on Lifespan and thereby encouraging it to meet or beat the budget.

[33]NEMC still objects, for example, to a $5 million charge in fiscal year 1998 for expenses relating to the COMPASS project, which Lifespan had initiated to address financial problems that pre-dated the affiliation. Notwithstanding its origins, however, that project was designed to benefit the entire system, including NEMC, and was allocated accordingly.

respective views and, in some instances, adjusted its methods so that the allocation would better reflect each hospital's actual use of corporate services. Disagreements about the allocation methods became infrequent during the second half of the affiliation.

165. This court is not persuaded that Lifespan's methods for allocating the corporate charges among its hospitals were any less favorable to NEMC, on the whole, than to any of the system's Rhode Island hospitals, or that a more direct allocation method would have been any more favorable to NEMC than the mix of methods that Lifespan used. Nor, again, is there any reliable evidence that Lifespan's allocation methods departed from standard industry practice.

166. At various points during the affiliation, NEMC requested information from Lifespan regarding the corporate overhead charges. As NEMC's budget director John Greenwood acknowledged, Lifespan officials "tried to provide [NEMC] with as much details as they ha[d]," including a breakdown of the charges by department or other cost area. This court is not persuaded that Lifespan ever refused to provide information that NEMC requested on that topic.

167. During the second half of the affiliation, NEMC complained frequently to Lifespan about the amount of corporate overhead charges. Lifespan maintained that the charges were fair

68

and reasonable. At the end of fiscal year 2001, without Lifespan's knowledge, NEMC engaged an outside consultant, Applied Management Systems ("AMS"), to analyze the charges. AMS reported that Lifespan's annual overhead expenses exceeded industry benchmarks by about $7 million.

168. In 2002, as part of preparing to disaffiliate from Lifespan, NEMC engaged another outside consultant, Cap Gemini Ernst & Young, to analyze Lifespan's corporate overhead charges. Like AMS, Cap Gemini reported that Lifespan's annual overhead exceeded industry benchmarks by about $7 million. The report pointed to specific areas where, in Cap Gemini's view, NEMC received no value from Lifespan's services, or where NEMC and Lifespan were duplicating efforts.

169. Cap Gemini acknowledged, however, that "[f]or many critical areas . . . data availability was severely limited, as the majority of information was at the corporate offices of Lifespan."[34] Both its report and AMS's report were based on a simple comparison of NEMC's corporate overhead charges (by department) to the overhead reported by other healthcare systems. Moreover, both reports were commissioned by NEMC for the purpose

---

[34]NEMC blames Lifespan for that lack of information, but Lifespan was not involved in the studies or given an opportunity to assist Cap Gemini or AMS. It is worth noting, moreover, that NEMC is seeking to have it both ways: accusing Lifespan of providing insufficient information for NEMC to evaluate the corporate charges, but then asking this court to deem those charges excessive based largely on benchmark analyses of the information that Lifespan provided.

of bolstering its complaints. This court is not persuaded that either report provides a reliable, unbiased analysis of Lifespan's corporate overhead charges.

170. There were some areas where Lifespan and NEMC duplicated efforts, particularly with respect to financial services. But much of that duplication was the inevitable, and expected, result of an affiliation between two large entities. To the extent that the duplication exceeded expectations, it was because of NEMC's reluctance to fully integrate itself into Lifespan's system, not from any over-reaching on Lifespan's part. NEMC still received the benefit of Lifespan's services in any areas of duplication.[35]

### ii. Rulings of law

#### a. Attorney General's breach of fiduciary duty claim

171. This court has already ruled that Lifespan owed a fiduciary duty to NEMC during the affiliation. See Lifespan, 731 F. Supp. 2d at 238-41. Lifespan specifically owed a fiduciary duty to NEMC with regard to the corporate overhead charges, by virtue of the control that Lifespan exercised over the amount of those charges and the "faith, confidence, and trust" that NEMC

---

[35]NEMC also received the benefit of Lifespan's services in the areas where Cap Gemini purportedly found no value to NEMC, which included services for system integration and shared services coordination, and the facilities costs for Lifespan's corporate headquarters.

70

placed in Lifespan's judgment. Id. (quoting Harbor Schools, 843 N.E.2d at 1064).

172. The Attorney General argues, first, that Lifespan breached its fiduciary duty to NEMC by basing its corporate overhead charges on budget projections, rather than actual expenses. But Lifespan's budget projections were designed, in good faith, to equal actual expenses, and it was fair and reasonable for Lifespan to use a budget-based approach. See ¶¶ 158-162, supra. The Attorney General has not proven that Lifespan acted disloyally to NEMC or departed from the standard of care in that regard.

173. The Attorney General argues, next, that Lifespan breached its fiduciary duty to NEMC by using unfair methods to allocate corporate overhead charges among the system's hospitals. But Lifespan made a reasonable, good-faith effort to allocate the charges fairly, with input from NEMC and the Rhode Island hospitals. See ¶¶ 163-165, supra. The Attorney General has not proven that Lifespan acted disloyally to NEMC or departed from the standard of care in that regard either.

174. The Attorney General also argues that Lifespan breached its fiduciary duty to NEMC by failing to disclose sufficient information regarding the corporate overhead charges. But Lifespan made reasonable, good-faith disclosures to NEMC throughout the affiliation, showing how the charges were

allocated and for what services.  See ¶¶ 164, 166, supra.  The Attorney General has not proven that Lifespan acted disloyally to NEMC or departed from the standard of care in that regard.

175.  The Attorney General also argues that Lifespan breached its fiduciary duty by charging NEMC for duplicative corporate services.  But NEMC, not Lifespan, was responsible for any such duplication, beyond that which was inevitable and expected as a result of the affiliation.  See ¶ 170, supra.  The Attorney General has not shown that Lifespan acted disloyally or departed from the standard of care in charging NEMC for duplicative services.

176.  It is important, in considering the duplication and allocation issues, see ¶¶ 173 and 175, supra, to keep in mind that Lifespan had a fiduciary duty not only to NEMC, but also to the system's other hospitals.  It would have been unfair to those hospitals for Lifespan to exempt NEMC from paying its share of corporate services designed to benefit the entire system, merely because NEMC had duplicated them, or to use an allocation method designed to favor NEMC over the other hospitals.  Lifespan had to strike a fair balance between competing hospital interests.[36]

_____

[36]See, e.g., Dana Brakman Reiser, Decision-Makers Without Duties:  Defining the Duties of Parent Corporations Acting as Sole Corporate Members in Nonprofit Health Care Systems, 53 Rutgers L. Rev. 979, 1009 (2001) (noting that hospital subsidiaries in a non-profit healthcare system have "potentially compet[ing]" interests and that, given "the realities of that

177. Finally, the Attorney General argues that Lifespan breached its fiduciary duty by charging NEMC excessive amounts for corporate overhead. As just discussed, however, the charges resulted from reasonable, good-faith processes. See ¶¶ 172-176, supra. While they may have been on the high end compared to some other healthcare systems, this court is not prepared to rule that they were unreasonably high or that Lifespan acted disloyally in setting them at the level it did.[37]

### b. NEMC's indemnification claim

178. NEMC makes essentially the same arguments in support of its indemnification claim as the Attorney General made on her breach of fiduciary duty claim. For the reasons just discussed, NEMC has not proven that Lifespan committed intentional misconduct or gross negligence, or made any misrepresentations, with regard to the corporate overhead charges. See ¶¶ 172-177, supra. So NEMC is not entitled to indemnification on that basis.

---

context," the "fairness" of actions affecting multiple hospitals "should be defined with reference to the system" as a whole, not "as if the subsidiary was still freestanding").

[37]The Attorney General argues that the corporate overhead charges constituted a form of self-dealing and that Lifespan therefore bears the burden of proving that the charges were fair to NEMC. See, e.g., Demoulas, 677 N.E.2d at 181. This court need not resolve that issue because, even assuming arguendo that the Attorney General's argument is correct, Lifespan has satisfied its burden of proof.

**E.** *Counterclaims relating to NEMC's financial performance*

Finally, NEMC and the Attorney General each seek to hold Lifespan liable for NEMC's poor financial performance during the affiliation. This court makes the following findings of fact and rulings of law on those claims, which result in no liability for Lifespan, beyond that already assessed with regard to payor contracting and the interest rate swap.

### i. Findings of fact

179. As discussed in Part I, <u>supra</u>, Lifespan and NEMC conducted "due diligence" before entering into the affiliation. As part of that process, NEMC engaged an outside consultant, Mitchell Creem of the accounting firm Tofias Fleishman Shapiro & Co. (who later became NEMC's CFO), to analyze how the affiliation would affect NEMC's financial performance in future years. Creem prepared detailed financial projections, which were shared with both NEMC and Lifespan.

180. Lifespan and NEMC also jointly engaged an outside consultant, the accounting firm Ernst & Young LLP, to quantify and document the potential efficiency gains that could be achieved through the affiliation. Using Creem's financial projections as a baseline, Ernst & Young estimated that the affiliation would result in annual net savings to NEMC in the range of $13.45 to $14.6 million.

181. Based on those projections, Lifespan and NEMC officials mutually believed that the affiliation would enable NEMC to return a positive operating margin. Lifespan's CFO John Schibler conveyed that belief and provided those projections to the Rhode Island Attorney General, describing the projections as "conservative" and "attainable," and indicating that Lifespan would take "aggressive" measures, if necessary, in an effort to achieve them.

182. Lifespan never promised or guaranteed to NEMC, however, that it would, in fact, return NEMC to a positive operating margin or achieve the efficiency gains projected by Ernst & Young.[38] Nor were any of Lifespan's statements understood by NEMC officials as a promise or guarantee to that effect. Lifespan and NEMC officials mutually understood that, despite their best efforts, the projected improvements might not be achieved.

183. NEMC never achieved a positive operating margin during the affiliation. NEMC's expert Rajan Patel testified, and this court finds, that NEMC had operating losses of about $25 million

---

[38]NEMC points to a memorandum, written in September 1998, in which Lifespan's senior vice president of institutional advancement, David Slone, stated to Lifespan's CEO that the depreciation write-down would "return NEMC to a positive operating margin--as we promised when we took control of that organization." This court is not persuaded, however, that Slone's isolated use of the word "promise," in reference to events occurring a year earlier, was an accurate description of what happened or reflected personal knowledge.

in fiscal year 1998, $16.2 million in fiscal year 1999, $15.8 million in fiscal year 2000, $32.3 million in fiscal year 2001, and $29 million in fiscal year 2002 (after setting aside the depreciation write-down and certain other accounting adjustments not reflective of NEMC's actual performance).

184. Even after accounting for non-operational income, NEMC never achieved a positive total margin during the affiliation. Patel testified, and this court finds, that NEMC had total losses of about $9.2 million in fiscal year 1998, $5.8 million in fiscal year 1999, $1.1 million in fiscal year 2000, $25.6 million in fiscal year 2001, and $28.9 million in fiscal year 2002 (again, after setting aside those accounting adjustments not reflective of NEMC's actual performance).

185. NEMC's total losses would have been even larger in fiscal years 2000 to 2002 if not for NEMC's decision, on the advice of its CFO and with Lifespan's approval, to draw down its general reserves in each of those three years. General reserves are an accounting mechanism used to set aside money for unknown events. NEMC reduced its general reserves by $5.3 million in fiscal year 2000, $8.7 million in fiscal year 2001, and $14.1 million in fiscal year 2002, which had the effect of reducing its total losses by those amounts.

186. As the annual margins indicate, NEMC's financial performance improved somewhat from the beginning of the

affiliation through fiscal year 2000, but then deteriorated again in fiscal years 2001 and 2002, leaving NEMC with fewer net assets at the end of the affiliation (about $219 million) than it had at the beginning (about $289 million), less cash on hand (about $44 million, compared with about $47 million at the beginning), and in worse financial condition overall.

187.  Patel testified that NEMC's margin and various other financial metrics fell below industry benchmarks throughout the affiliation.  Specifically, he testified that other teaching hospitals nationwide generally achieved positive operating margins in each of those years, and total margins in the range of 2 to 5 percent, whereas NEMC had negative operating margins each year, and total margins as low as negative 5 to 6 percent in 2001-2002.

188.  This court is not persuaded, however, that the performance of teaching hospitals nationally is a reliable benchmark for evaluating NEMC's performance during the affiliation.  Boston teaching hospitals faced a different set of circumstances over that period than hospitals in other states, and their financial results (including margins) generally were not as strong.  Moreover, NEMC's circumstances were unique even among Boston teaching hospitals.  See ¶¶ 67-71, supra.

189.  NEMC's financial performance followed a different trajectory from that of most other teaching hospitals.  Whereas

77

NEMC's performance improved somewhat during the first three years of the affiliation, other teaching hospitals generally saw their margins fall by nearly half, in large part because of the Balanced Budget Act of 1997, which reduced Medicare payments. See note 12, supra. Then, just as other hospitals generally stabilized their financial performance, NEMC's performance deteriorated again.

190. Patel offered little to no testimony on why NEMC's financial performance differed from that of other teaching hospitals, or what Lifespan could have done to improve it. One thing that Lifespan repeatedly urged NEMC to do, especially during 2001-2002, was to reduce its costs, including its number of full-time employees and its average length of stay. But NEMC struggled to do so, and to some extent resisted Lifespan's advice, leading Lifespan to reject--for the first and only time-- NEMC's budget for fiscal year 2003.

191. Lifespan had financial problems of its own at the beginning of the affiliation, reporting a large loss for fiscal year 1998 (shortly after the affiliation started), which resulted in an investigation by the Rhode Island Attorney General and a change of command at Lifespan (then-CEO William Kreykes was replaced by current CEO George Vecchione). Unlike with NEMC, however, Lifespan's financial performance improved steadily throughout the affiliation.

### ii. Rulings of law

#### a. Attorney General's breach of fiduciary duty claim

192. This court has already ruled that Lifespan owed a fiduciary duty to NEMC during the affiliation. See Lifespan, 731 F. Supp. 2d at 238-41. Lifespan specifically owed a fiduciary duty to NEMC with regard to its oversight of NEMC's financial performance, by virtue of the control that Lifespan exercised over NEMC and the "faith, confidence, and trust" that NEMC placed in Lifespan's judgment and advice. Id. (quoting Harbor Schools, 843 N.E.2d at 1064).

193. The Attorney General argues that Lifespan breached its fiduciary duty to NEMC by failing to return NEMC to a positive operating margin and failing to achieve the efficiency gains projected by Ernst & Young. But, outside of payor contracting, see Part III.B, supra, and the interest rate swap, see Part III.C, supra, the Attorney General has not proven any specific departure(s) from the standard of care by Lifespan, or any disloyal acts, that caused or contributed to NEMC's poor financial performance.

194. This court cannot accept the conclusory proposition, put forth by NEMC's expert Patel, that because Lifespan exercised control over NEMC, and because NEMC's financial performance failed to improve as projected, Lifespan must have departed from

79

the standard of care (violating what the Attorney General and NEMC call the "duty to improve NEMC's performance"). Countless factors affect the financial performance of a hospital of NEMC's size and scope, and many of them cannot be predicted or controlled by the hospital's corporate parent. This is no place for "res ipsa loquitur"-style reasoning.

195. It is important to note, moreover, that NEMC's financial performance improved somewhat during the first three years of the affiliation, at a time when other teaching hospitals' margins were generally moving in the opposite direction. See ¶ 189, supra. NEMC's own CFO (Creem) considered NEMC's financial performance over that period "very successful." That demonstrates the flaw in Patel's logic and suggests that Lifespan may even have out-performed industry standards in some respects.

196. The Attorney General also argues that Lifespan breached its fiduciary duty by misrepresenting that it would return NEMC to a positive operating margin and achieve the projected efficiency gains, without exercising reasonable care in determining if it actually could do so, and without delivering on that commitment. But Lifespan never made any promises or guarantees that it would actually achieve those financial projections, nor did NEMC officials understand it to have done so. See ¶ 182, supra.

80

197. Moreover, "false statements of conditions to exist in the future, and promises to perform an act" do not constitute misrepresentations "unless the promisor had no intention to perform the promise at the time it was made." Cumis, 918 N.E.2d at 49. At the time of the alleged misrepresentations, Lifespan reasonably believed that it would be able to achieve the projected improvements and intended, in good faith, to achieve them. So, even if it had promised to achieve those results, the promises would not be misrepresentations.

198. Finally, in a combination of the two arguments already discussed, the Attorney General argues that Lifespan "created its own yardstick" by endorsing Ernst & Young's projections and representing that it could achieve them. But the fact that a fiduciary may have held itself to a higher standard, or expressed a good-faith belief that it could achieve a higher standard, does not change the standard for proving a breach of fiduciary duty. The Attorney General has not met that standard.

### b. NEMC's indemnification claim

199. NEMC makes essentially the same arguments in support of its indemnification claim as the Attorney General made on her breach of fiduciary duty claim. For the reasons just discussed, NEMC has not proven that Lifespan committed intentional misconduct or gross negligence, or made any misrepresentations,

with regard to NEMC's financial performance, except to the extent already addressed in connection with payor contracting and the interest rate swap. See ¶¶ 193-198, supra.

## IX. Conclusion

Based on the findings and rulings set forth above, this court awards Lifespan $13,903,948 on its claim against NEMC for breach of contract, and awards $14,176,704 to NEMC and the Attorney General on their counterclaims against Lifespan for indemnification and breach of fiduciary duty, resulting in a net award of $272,756 to NEMC. The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge
District of New Hampshire

Dated: May 24, 2011

cc: Deming E. Sherman, Esq.
    Patricia A. Sullivan, Esq.
    Rachel K. Caldwell, Esq.
    Bruce A. Singal, Esq.
    David A. Wollin, Esq.
    Jeffrey T. Rotella, Esq.
    Michelle Peirce, Esq.
    Adam M. Ramos, Esq.
    Eric Carriker, Esq.
    Jonathan C. Green, Esq.
    Patrick J. Tarmey, Esq.

## APPENDIX: PAYOR CONTRACTING DAMAGES

### UNITED

| Year | Actual revenue* | Inflation (Boston all-item CPI plus 1%)** | Adjusted revenue | Lost revenue |
|------|-----------------|-------------------------------------------|------------------|--------------|
| 2000 | $7,103,411 | 6.9% | $7,593,546 | $490,135 |
| 2001 | $7,103,411 | 5.3% | $7,996,004 | $892,593 |
| 2002 | $7,103,411 | 5.3% | $8,419,792 | $1,316,381 |
| Total | $21,310,233 | | $24,009,342 | **$2,699,109** |

### CIGNA

| Year | Actual revenue* | Inflation (Boston medical CPI)** | Adjusted revenue | Lost revenue |
|------|-----------------|----------------------------------|------------------|--------------|
| 2000 | $5,504,385 | 12.7% | $6,203,442 | $699,057 |
| 2001 | $5,504,385 | 5.6% | $6,550,835 | $1,046,450 |
| 2002 | $5,504,385 | 5.6% | $6,917,682 | $1,413,297 |
| Total | $16,513,155 | | $19,671,959 | **$3,158,804** |

* These numbers reflect the amount that NEMC collected from United and Cigna during fiscal year 2003, the earliest year for which data is still available. This court finds that the 2003 collections data is a reasonable approximation for the revenue collected from United and Cigna during each year of the affiliation (and, as Lifespan's expert John Lavan acknowledged, "as good as anything we have"). If anything, it is conservative, because NEMC's revenue from those payors had generally been in decline. This court has excluded United collections for inpatient services, because they were subject to built-in inflationary increases, see ¶ 73, supra, and Cigna collections for transplant services, because they were covered by a contract separately negotiated during the affiliation, see ¶ 72, supra.

** These percentages reflect the CPI increases for the year preceding the one listed in the first column. For the year 2000, because the United and Cigna contracts had not been negotiated since 1997, see ¶ 73, supra, the percentages reflect the total, compounded inflation for 1998 and 1999.